**FMC CORPORATION**

v.

**UNITED STATES DEPARTMENT OF COMMERCE, et al.**

**No. 90–1761.**

United States District Court, E.D. Pennsylvania.

Feb. 19, 1992.

Neil G. Epstein, Carol L. Press, Hangley, Connolly, Epstein, Chicco, Foxman & Ewing, Philadelphia, Pa., for plaintiff and counter defendant.

Virginia Gibson–Mason, Philadelphia, Pa., Ronald Spritzer, U.S. Dept. of Justice, Environmental Defense Section, Environmental & Natural Resources Div., Washington, D.C., Glen Freyer, U.S. Dept. of Justice, Environmental & Natural Resources, Environmental Defense Section, Washington, D.C., for defendants and counter claimants.

## MEMORANDUM

NEWCOMER, District Judge.

This action is brought pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9601–9675, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. Plaintiff FMC Corporation ("FMC") owned and operated, from 1963 to 1976, the Avtex site in Front Royal, Virginia, ("the Facility"), a site which has been listed on the National Priorities List since 1986. FMC seeks indemnification from the defendants for some portion of its present and future response costs of response in performing removal actions and other response actions at the Facility. FMC bases its claim on United States Government ("Government") activities during the period of January, 1942 through 1945 relating to the operation of a rayon manufacturing facility at the Avtex site, and contends that these activities render the Government liable as an "owner," "operator," and, or "arranger" under section 107 of CERCLA, 42 U.S.C. § 9607.

During World War II, after the bombing of Pearl Harbor and the Japanese conquest of Asia, the United States suffered a loss of 90% of its crude rubber supply. An urgent need arose for natural rubber substitute to be used in manufacturing airplane tires, jeep tires and other war related items. The best rubber substitute available was high tenacity rayon tire cord. The Facility was one of the major producers of high tenacity rayon yarn, which was twisted and woven into high tenacity rayon tire cord. FMC presented evidence at trial showing that during the World War II period, the Government participated in managing and controlling the Facility, which was then owned by American Viscose Corporation ("American Viscose"), requiring the Facility to manufacture increasing quantities of high tenacity rayon yarn, which involved the treatment of hazardous materials and necessitated the disposal of hazardous materials. FMC also presented evidence showing that the Government owned "facilities" and equipment at the plant used in the treatment and disposal of hazardous materials.

## I. FINDINGS OF FACT:

### A. *Parties and Present Status of the Facility*

1. FMC is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business at 200 East Randolph Drive, Chicago, Illinois 60601, and with an office at 2000 Market Street, Philadelphia, Pennsylvania 19103.

2. Defendants United States Department of Commerce, Secretary of Commerce Robert Mosbacher are departments, agencies and instrumentalities of the United States Government.

3. The Facility is a rayon manufacturing facility located at 1169 Kendrick Lane, Front Royal, Virginia.

4. The Facility consists of a manufacturing plant, as well as 23 waste disposal basins and landfill areas, located on approximately 440 acres of land. (Docs. 128, p. 2; 129, p. 4).

5. Pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, the Facility was added to the National Priorities List ("NPL") in 1986. The NPL is a prioritized list of sites around the United States considered by the Environmental Protection Agency ("EPA") to require remedial action.

6. FMC purchased the Facility in 1963 from American Viscose.

7. In 1976, FMC sold the Facility to Avtex Fibers–Front Royal, Inc. (Avtex Fibers, Inc. and Avtex Fibers–Front Royal, Inc. are collectively referred to as "Avtex").

8. On or about November 10, 1989, Avtex terminated all manufacturing operations at the Facility.

9. On February 6, 1990, Avtex Fibers, Inc. and Avtex Fibers–Front Royal, Inc. filed Petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania (Docket Nos. 90–20289 and 90–20290, respectively).

B. *Disposal and Releases of Hazardous Substances and Response Actions at the Facility*

10. In 1982, carbon disulfide, a chemical used in manufacturing high tenacity rayon was identified in ground water in the vicinity of the Facility.

11. In August 1986, Avtex signed an Administrative Order by Consent ("the Consent Order") with the EPA whereby Avtex agreed to conduct a Remedial Investigation/Feasibility Study ("RI/FS") at the Facility. In January 1988, the Consent Order was amended to include FMC. (Doc. 130).

12. The RI/FS conducted pursuant to the Consent Order revealed the presence of carbon disulfide, lead and zinc in viscose waste materials which had been disposed of at the Facility. (Doc. 129, p. 7).

13. The RI/FS conducted pursuant to the Consent Order showed the presence of carbon disulfide and arsenic in off-site ground water in the vicinity of the Facility. (Doc. 129, p. 7).

14. On September 30, 1988, after completion of the RI/FS, the EPA issued a Record of Decision ("ROD") which presented the EPA's selected initial remedial action, called Operable Unit One. Operable Unit One was directed toward the remediation of ground water contamination and certain on-site waste basins. (Doc. 131).

15. By letter dated January 13, 1989, the EPA notified the Department of Commerce that based upon certain information regarding the activities of the War Productions Board ("WPB") at the Facility during World War II, the EPA considered the Department of Commerce a potentially responsible party under CERCLA. (Doc. 108, pp. 1–4).

16. In the January 13, 1989 letter, the EPA invited the Department of Commerce to participate in formal negotiations, the goal of which was to develop a consent decree in which the Department of Commerce (and other potentially responsible parties) would commit to conduct a Remedial Design/Remedial Action at the Facility to implement the Operable Unit One ROD. (Doc. 108, pp. 1–4).

17. By letter dated May 11, 1989, which responded to the EPA's January 13, 1989 letter, the Department of Commerce took the position that it was not liable as a past operator of the Facility and declined to participate in formal negotiations with the EPA. (Doc. 108, p. 5).

18. On June 30, 1989, the EPA issued an Administrative Order ("the June 30 Order") directing Avtex and FMC to undertake remedial activities to implement the Operable Unite One ROD. (Doc. 129).

19. By letter dated December 8, 1989, the EPA requested FMC to conduct a new RI/FS in order to establish a final remedy for the Facility. (Doc. 127).

20. The scope of the new RI/FS has been expanded to include the entire facility and is far more extensive than the scope of

the RI/FS previously conducted by Avtex and FMC. (Doc. 127).

21. February 2, 1990, the EPA issued a second Administrative Order ("the February 2 Order") directed solely to FMC. The February 2 Order stated that sampling by the EPA had revealed the presence of carbon disulfide, cadmium, chromium, lead, phenol, zinc and mercury in certain on-site waste basins at the Facility and directed FMC to take certain response actions with respect to these basins. (Doc. 128).

22. The response actions directed by the February 2 Order are in addition to those required under the June 30 Order.

23. The EPA has informed FMC that it expects FMC to undertake further remedial activities to address contamination at the Facility.

24. There has been a release or threatened release of hazardous substances from the Facility.

25. There has been a release or threatened release of hazardous substances from the installations, equipment, pipes and/or pipelines owned by the Government at the Facility.

26. From 1985 through the present, FMC has incurred significant costs of response actions, taken under CERCLA, at the Facility.

27. The response actions that FMC has been required to undertake and is presently undertaking at the Facility include the remedial investigation, feasibility study and clean-up of the same type of hazardous substances that were generated and disposed of at the Facility and at the installations, equipment, pipes and/or pipelines owned by the Government at the Facility during the periods 1942 to 1948.

C. *Pre–World War II History of the Facility*

28. During the period from 1937 through 1939, American Viscose purchased several tracks of land in Front Royal, Virginia. American Viscose then constructed a plant on the site and began manufacturing textile rayon at the Facility in or around 1940.

29. Before World War II, no machines at the Facility were set up to produce high tenacity rayon. The Facility had to later convert existing equipment in order to start high tenacity rayon production. The machines were adapted by changing the gears and the speed of the spinning wheels. (Testimony of Dr. Stuhr, technical manager of American Viscose—who was employed at the Facility from 1940–1948).

30. As of 1940, American Viscose was a subsidiary of Courtaulds, Ltd. ("Courtaulds") a British corporation. (Doc. 9049).

31. The British Government, in 1941, sold or caused to be sold securities of American Viscose previously owned by Courtaulds to a group of United States banks. (Doc. 9049).

32. American Viscose became a publicly-held corporation in 1941.

33. In January 1942, the WPB was established by Executive Order 9024, 7 Fed. Reg. 329 (1942). (Doc. 111).

34. The Chairman of the WPB was empowered pursuant to Executive Order 9024 to issue directives to industry in connection with war procurement and production, including directives with respect to purchasing, contracting, specification, construction, requisitioning, plant expansion, conversion and financing. (Doc. 111).

35. Executive Order 9040, 7 Fed.Reg. 527 (1942) (Doc. 112), conferred upon the WPB the powers previously delegated to the Office of Production Management ("OPM") which, under Executive Order 8629, 6 Fed.Reg. 191 (1941), included the authority to "[f]ormulate and execute in the public interest all measures needful and appropriate in order ... to increase, accelerate, and regulate the production and supply of materials, articles and equipment and the provision of emergency plant facilities and services required for the national defense" and to "[f]ormulate plans for the mobilization for defense of the production facilities of the Nation, and to take all lawful action necessary to carry out such plans." (Doc. 109).

36. Under Executive Order 9040, the WPB was delegated the authority vested in

the President of the United States by section 120 of the National Defense Act of 1916, ch. 134, 39 Stat. 213 (1916) (Doc. 117), previously conferred upon OPM under Executive Order 8629, to seize the plants which did not comply with production orders and to enforce production orders under threat of criminal penalties. (Docs. 109, 112).

37. The WPB's authority was again expanded by Executive Order 9125, 7 Fed. Reg. 2719 (1942) (Doc. 113), which delegated to the WPB the powers vested in the President by Title III of the Second War Powers Act, ch. 199, 56 Stat. 176 (1942), including powers with respect to the allocation of materials and facilities (Doc. 1180).

38. Executive Order 9125 provided that the Chairman of the WPB could exercise "the powers, authority, and discretion conferred upon him by this and any other Order through such officials or agencies ... and in such manner as he may determine." (Doc. 113).

39. Pursuant to Executive Order 9638, 10 Fed.Reg. 12591 (1945), the WPB was abolished effective as of November 1945 and its powers and functions were transferred to the Civilian Production Administration ("the CPA"). (Doc. 114).

40. The CPA was abolished in 1946 by Executive Order 9809, 11 Fed.Reg. 14281 (1946). (Doc. 115). In 1947, under Executive Order 9841, 12 Fed.Reg. 2645 (1947), its residual powers and functions were transferred to the Secretary of Commerce. (Doc. 116).

*The High Tenacity Rayon Yarn Program Was Urgent and Critical.*

41. High tenacity rayon yarn was a necessary component of critical war-related end products, including tires for airplanes and trucks which were used by the military. (Docs. 2002; 4042A).

42. The actual or projected demand for high tenacity rayon yarn for use in critical products greatly exceeded the actual or projected supply and production capacity. (Docs. 2001, pp. 1, 5–6; 2001D; 2005, pp. 6–8; 3063, pp. 2–3).

43. From the early days of the war effort and throughout the War, the rayon tire cord program, of which high tenacity rayon yarn was the key component, was identified as one of the most urgent and critical programs. (Docs. 2005, p. 1; 3020; 3038, p. 3; 3047; 3050B; 3052; 3066, pp. 1–2; 3069, pp. 1–2; 3070, p. 2; 3078, p. 1; 3083, p. 1; 3091, p. 1; 3128A; 4034, p. 1; 4042A; 4055, p. 5; 4059D; 4064, p. 2; 4073).

44. The Chairman of the WPB characterized the production of high tenacity rayon yarn as "one of the most critical in the entire production program." (Doc. 4034, p. 1).

45. As of 1942, American Viscose was the largest rayon producer in the United States.

46. From 1942 through the end of World War II, the Front Royal Facility of American Viscose played a key role in satisfying the urgent need for high tenacity rayon yarn. (Docs. 4097; 5022, pp. 2, 4).

47. Through a series of conversions and expansions deemed "essential to the war effort," the Facility was eventually required by the Government to produce one-third of the Nation's increased production of high tenacity rayon yarn. (Docs. 3063; 4034, p. 1).

48. The Government (including the WPB) considered facilities which produced high tenacity rayon yarn to be "war plants" directly related to the war effort and subject to maximum control by the Government. (Doc. 4080; *see* Docs. 3075; 4055, pp. 5–11).

49. The Director of the Textile, Clothing and Leather Division of the WPB, the division directly responsible for high tenacity rayon yarn, considered the American Viscose projects (including the projects at the Facility) to a considerable extent to be Government projects directly related to the war effort. (Doc. 4080).

50. Since the Facility was engaged in a program deemed critical to the success of the war effort, if the Facility did not comply with the Government's production requirements, the Facility would have been

seized by the Government. (Doc. 4066; *see* Doc. 4044).

51. During World War II, the Government took over numerous plants which, for a multitude of reasons, failed to meet production requirements, including a plant producing high tenacity rayon yarn owned by American Enka Corporation. (Docs. 9827; 9831; 9836).

*The Government Required the Facility To Produce Specified, Increased Quantities of High Tenacity Rayon Yarn and To Convert and Expand Its Plant To Fulfill These Production Requirements.*

52. As of 1941, the Government had identified the production of high tenacity rayon yarn as having special strategic importance. (Docs. 1004A, pp. 1–2; 1005, p. 3). In 1941, the industry's capacity to produce high tenacity rayon yarn was only approximately 200 million pounds per year. (Docs. 1004A, p. 1; 1005, pp. 1, 3; 3009A, p. 4).

53. As early as 1941, the Government predicted a severe shortage in the supply of high tenacity rayon yarn in the face of a growing military demand and began investigating the expansion of production capacity. (Doc. 1004A, pp. 1–2). The Government identified only four producers of this strategically important product. (Doc. 1005, p. 3).

54. One of the potential producers of this strategically important product identified by the Government was American Viscose and its Front Royal Facility. (Docs. 1004, p. 2; 1005, p. 3; 2005, p. 10, Table II).

55. Shortly after the WPB was created in January 1942, it determined that the potential military requirements for high tenacity rayon yarn exceeded production capacity and decided that the industry would have to convert machinery producing regular tenacity rayon to increase the production of high tenacity rayon yarn. (Docs. 2001, pp. 5–6; 200II; 2004A, p. 2).

56. As of January 1942, American Viscose's production capacity for high tenacity rayon yarn was approximately 5 million pounds per year. (Doc. 2002, p. 1).

57. In April 1942, the Army and Navy Munitions board initiated an expansion of the industry's high tenacity rayon yarn production capacity by approximately 20–25 million pounds. Approximately ten million pounds of this expansion was implemented at the Facility. (Docs. 2002, p. 1; 3036, p. 10; 5053, p. 10).

58. By mid–1942, the Government had determined that the use of high tenacity rayon yarn would save scarce crude rubber (Docs. 2005, pp. 1–3, 6–9, xi, App. C; 20006, pp. 3–4) and that high tenacity rayon yarn would be a "must" once tires could be made with synthetic rubber (Docs. 2003B, p. 1; 2005, pp. 1–3; 2007A, pp. 3–4).

59. In September 1942, the WPB decided that an increase in capacity to produce high tenacity rayon yarn would be required to ensure an adequate supply for use in synthetic rubber tires. (Docs. 2007A, p. 3–4; 2007B, pp. 2–3). On September 21, 1942, the WPB made Program Determination 57, which directed the expansion and conversion of existing plants to produce an additional 50 million pounds of high tenacity rayon yarn per year and assigned an AA–3 preference rating to the delivery of materials needed for the required expansion and conversion. (Docs. 2012A, p. 1; 2020; 3015; 3036, p. 10; 4099, p. 3).

60. Under Program Determination 57, American Viscose was ordered to convert and expand the Facility to produce an additional 10 million pounds of high tenacity rayon yarn per year. (Docs. 2012A, p. 2; 3036, p. 10; 3083, p. 2; 5032, p. 9; 5050A, pp. 5–6; 5053, p. 2).

61. In May 1943, the WPB predicted an annual deficit for 1944 of 108 million pounds in the supply of high tenacity rayon yarn and decided that the production of high tenacity rayon yarn would have to be expanded. (Docs. 3007; 3008A; 3012, p. 9).

62. Textile Requirements Committee Decision 42, dated May 10, 1943, provided for the expansion and conversion of existing plants to produce an additional 68 million pounds of high tenacity rayon yarn per year. (Doc. 3009, p. 2). The WPB assigned 25 million pounds of this increased

production to the Facility. (Docs. 3014, p. 1; 3015; 3019, p. 1).

63. The 68 million pound expansion directed by Textile Requirements Committee Decision 42 left a projected shortage of approximately 40 million pounds of high tenacity rayon yarn based on stated requirements. (Docs. 3030, pp. 2, 4–5; 3038, p. 3). Chairman Nelson appointed two members of his staff, H. LeRoy Whitney, Technical Consultant, and James Jacobson, Special Assistant, to report to him regarding whether an additional expansion of high tenacity rayon capacity should be implemented to meet the indicated shortage. (Doc. 3036, p. 2).

64. Messrs. Whitney and Jacobson reported to Chairman Nelson that based on available data there would be a serious deficiency in 1944 in high tenacity rayon yarn production and recommended that a 32 million pound expansion of capacity be instituted immediately at the American Viscose Front Royal Facility. (Doc. 3044, pp. 1–2; *see* Doc. 3055, p. 4). Program Determination 438, dated September 4, 1943, provided for the additional 32 million pound expansion (Docs. 3064B; 3066, pp. 1–2).

65. Under Textile Requirements Committee Decision 42 and program Determination 438, American Viscose was directed to expand the production capacity of the Facility to produce an additional 57 million pounds per year of high tenacity rayon yarn. (Doc. 4012B; *see* Docs. 3043, p. 1; 3095, p. 1; 5050A, pp. 4–6; 5053, pp. 2, 8).

66. Amendment 1 to Program Determination 438 assigned an AA–1 preference rating up to an aggregate of $19.4 million for the completion of facilities being converted and expanded under Program Determination 57, Textile Requirements Committee Decision 42 and Program Determination 438 to produce additional high tenacity rayon yarn. (Docs. 3065A; 3066, p. 4; 3069, pp. 1–2).

67. In 1945, the WPB made Program Determination 725, which directed the Facility to expand its capacity to produce an additional 22 million pounds per year of high tenacity rayon yarn. (Docs. 5012, p. 1; 5030A, p. 2; 5030D; 5050A, pp. 4–6; 5053, pp. 2, 8).

68. The production directions and requirements implemented by the WPB at the Facility stayed in effect until the WPB revoked them in August and September of 1945. (Docs. 5050A; 5053, p. 2).

69. The WPB's requirement that the Facility convert and expand its capacity to produce increased amounts of high tenacity rayon yarn forcibly diverted the Facility from producing regular textile rayon, for which consumer demand had not been fully met for several years before the War. (Docs. 2001, p. 6; 2001I; 2005, pp. 12–13; 2012A, p. 2; 4012B; 4022, p. 1; 5038).

70. The WPB required the Facility to convert and expand its capacity to produce increased amounts of high tenacity rayon yarn despite uncertainty as to whether all the high tenacity rayon yarn it directed the rayon industry to produce during the War could be used by the tire industry (Docs. 2004A; 3039; 3043, pp. 1–3; 3114; 3127B) and despite uncertainty as to whether there would be a post-War market for the product (docs. 3019, p. 9; 4090; 5001B, pp. 19–30, 34, 42, 47–48.

*The Government Exercised Active Control and Hands–On Participation in the Facility's Conversion and Expansion and Supplied Government–Owned Equipment to the Facility.*

71. Beginning no later than 1943, the rayon tire cord program received constant attention from the highest officials of the WPB, including Chairman Nelson, as well as top officials of the War Department and other Government departments and agencies. (*E.g.*, Docs. 3012, p. 8; 3035; 3036; 3044; 3047; 3075; 3076; 3079; 3128A; 4023; 4032A; 4034; 4064; 4073; 5002).

72. General Operations Circular 161, sent to all WPB bureau and division directors, informed them that the Chairman of the WPB, the Executive Vice Chairman and the Program Vice Chairman had all concurred in the necessity of giving special assistance to the scheduling of components for urgent rayon tire cord projects and identified the expansion projects at the Fa-

cility as urgent programs. (Docs. 3083; 4039).

73. The WPB took all steps which it considered necessary to ensure the timely completion of the required expansion of the Facility, including assigning two WPB representatives to the project to expedite the delivery of needed equipment. (*E.g.*, Docs. 3078, pp. 1, 4–9; 3079, pp. 1–5; 3128A; 4009, pp. 2, 11; 4018A; 4023; 4073, p. 2; 4080A, pp. 5–6; 4083, pp. 6–8; 4097, p. 2).

74. In order to implement the required plant expansion, the Government, through the Defense Plant Corporation ("DPC"), leased certain Government-owned equipment and machinery to the Facility, including 50 spinning machines, an acid spin bath system, piping for the spinning machinery and spin bath system, slashing equipment and viscose waste trucks. (Docs. 4005B; 4015C; 4024A; 4032A; 6006, pp. 8–11).

75. Pursuant to the terms of the Agreement of Lease between the DPC and American Viscose dated February 28, 1944, the Government received rent from American Viscose based upon the amount of high tenacity rayon yarn produced on the DPC equipment and machinery and controlled the use to which the DPC equipment and machinery could be put. (Doc. 4024A, pp. 5–6).

76. The Government contracted with Rust Engineering Company ("Rust"), the engineer-contractor with overall responsibility for the required expansion of the Facility, to design and install the DPC-owned equipment at the Facility. (Doc. 4041F).

77. By a contract dated March 28, 1944, to which Rust, DPC and American Viscose, as agent for DPC, were parties, Rust agreed to perform the necessary engineering, construction and installation work with respect to the DPC equipment, for which the Government agreed to pay Rust the cost of the work plus a fixed fee of $112,050. (Doc. 4041F, pp. 3–6). In addition, the Government agreed to reimburse American Viscose for a percentage of Rust's costs which could not be readily segregated as between the work relating to

the DPC equipment and the remainder of the expansion. (Doc. 4041F, pp. 5–6).

78. Under its contract with Rust, the Government had substantial control over and participation in the work related to the DPC equipment: for example, all plans, specifications and drawings had to be submitted to the DPC for approval; Rust had to obtain prior DPC approval for the purchase of supplies chargeable to the cost of the work; DPC had the right to promulgate rules governing all operations at the work site and to require the removal from work of any Rust employee whom DPC deemed unqualified or guilty of improper conduct; and DPC was to be represented on-site by a responsible field representative, who had the right to give directions to Rust with respect to the performance of the work. (Doc. 4041F).

79. The Government, through the DPC and Reconstruction Finance Corporation ("RFC"), collected rent from American Viscose on the Government-owned equipment and machinery at the Facility through approximately March 1947, and continued to own certain of the equipment and machinery at the Facility until at least March 1948. (Doc. 7001, pp. 1, 3, 8–11).

80. At the time of the DPC's initial ownership of equipment and machinery at the Facility, the DPC and RFC were administered by the Department of Commerce and the Secretary of Commerce. (Docs. 125; 4012B; 4024A, p. 1; 4032A; 4041F, p. 1).

81. During the period that they owned equipment and machinery at the Facility, the DPC and RFC were instrumentalities of the United States Government. (*E.g.*, Doc. 4024A, p. 1). Under Executive Order, the Government has assumed the liabilities of DPC and RFC.

*Government Control of Raw Materials Required for Production of High Tenacity Rayon Yarn, Government Actions in Causing Those Raw Materials to be Supplied to the Facility and Government Control of Their Use Throughout the Production Process.*

82. There are five principal components of high tenacity rayon yarn: sulfuric acid,

carbon bisulfide, wood pulp, chemical cotton linters and zinc. (Doc. 2005, pp. 20-23, Table VIII; Almy Dep.,[1] pp. 21-30, Testimony of Dr. Stuhr).[2]

83. These materials were quite scarce during World War II. (Testimony of Dr. Stuhr). The Facility's ability to satisfy the Government's requirements for increased production of high tenacity rayon yarn was dependent upon obtaining these critical materials.

84. As early as November 1941, the Government, anticipating the need for significant increases in the production of high tenacity rayon yarn, projected possible shortages of these five basic raw materials. (Docs. 1004A, p. 1; 1005, pp. 1-2; 2005, p. 20).

85. To assure an adequate supply of these raw materials, the Government undertook a series of actions to increase the supply of these scarce materials to producers of the yarn in general and to the Facility in particular.

86. In 1942, the WPB issued General Preference Order M-257, which brought sulfuric acid under total WPB allocation control. (Docs. 2015F; 3001F).

87. By 1943, the WPB had determined that required increases in the rayon tire cord program would result in the need for a new sulfuric acid plant. (Doc. 3041, p. 3).

88. A new sulfuric acid plant, which was owned by the Government and built entirely with Government funds, was built immediately adjacent to the Facility and was connected to the Facility by pipeline. (Docs. 4096B, p. 2; 5053C, p. 1; 9005, p. 3).

89. The purpose of building the plant and locating it in Front Royal was to supply the Facility with sufficient sulfuric acid to meet its increased production requirements of high tenacity rayon yarn. (Doc. 4096B, p. 2).

90. The sulfuric acid plant was leased by the Government to General Chemical Company and rental payments to the Government were based on the amount of sulfuric acid produced and sold. (Doc. 4096A, p. 1).

91. Virtually the entire output of the sulfuric acid plant was delivered to the Facility via pipeline. Consequently, the rental actually received by the Government was based upon the amount of sulfuric acid supplied to the Facility. (Doc. 4096B, pp. 1-2).

92. The Government retained the right to terminate the lease with General Chemical if the sulfuric acid plant was no longer required for the Government's purposes or if General Chemical refused "to give production priority." (Doc. 4096A, p. 1).

93. In the initial stages of the War, the Government recognized the need for strict allocation of carbon bisulfide to assure that the demand for high tenacity rayon would be met. (Docs. 2005, p. 22; 3009C; 3009D).

94. Based on its analysis of the demand for carbon bisulfide, including high tenacity rayon yarn production requirements, the Government projected a large deficit in the available supply of carbon bisulfide unless there was a significant increase in production. (Docs. 3034B, p. 1; 3038A; 3041, p. 3; 3041A; 3112A).

95. To satisfy the Facility's need for carbon bisulfide to meet its increasing high tenacity rayon requirements, the WPB designated Stauffer Chemical Company to build a new plant in the Front Royal area to produce 26.4 million pounds of carbon bisulfide per year. (Docs. 3041A; 3052, pp. 59-60; 4011A; 4016, p. 3; 9009, p. 2).

96. The entire output of the Stauffer Chemical plant was to be consumed by the Facility. (Docs. 4011A, p. 3; 9009, p. 2).

97. The WPB issued Stauffer Chemical requisite authorization to build the plant and a priority rating which allowed Stauffer to obtain controlled materials such as steel, cast iron, wood and copper wire which were necessary to construct the plant. (Doc. 4061, p. 3).

---

1. References to the deposition of Richard R. Almy are in the form "Almy Dep., p. ___."

2. The same materials are used in the production of average tenacity rayon, but in different concentrations. (Testimony of Dr. Stuhr).

98. By 1942, the WPB had identified wood pulp and cotton linters as scarce chemical raw materials necessary for rayon production. (Docs. 2005, pp. 20–22; 2013, p. 1).

99. The WPB brought wood pulp under allocation through General Preference Order M–93, which precluded the shipment or acceptance of any delivery of wood pulp without prior WPB approval. (Doc. 2001J).

100. Similar restrictions were applied to cotton linters by Conservation Order M–157. (Docs. 2005, p. 20; 3004B).

101. Despite these controls, the WPB still projected significant shortages of both materials with respect to the expanded high tenacity rayon yarn production program. (Docs. 3046A, p. 1; 3048; 3061; 3126A).

102. In an effort to increase the amount of pulp available for production of high tenacity rayon yarn, the WPB approved new construction programs for the three major domestic suppliers of this material. (Doc. 4016, p. 2).

103. A construction program at the Buckeye Cotton Oil Company, a major supplier of pulp to the Facility, was financed entirely with funds provided by the DPC. (Doc. 5056, p. 4).

104. In addition to increasing the supply of these four basic raw materials to the Facility, the Government, through the priority rating system, retained control over the use of these raw materials throughout the Facility's production process.

105. Production orders placed with American Viscose had attached to them priority ratings issued by the WPB which enabled American Viscose to obtain the raw materials necessary to fill production orders.

106. When American Viscose obtained these raw materials through the use of a priority rating attached to an order for high tenacity rayon yarn, it was required to use these materials for the specific purpose authorized by the Government.

107. The use of these raw materials for any other purpose would have violated the priority regulations and would have subjected American Viscose to civil and criminal penalties.

108. As a result of its involvement with the supply and control of the basic raw materials necessary for high tenacity rayon yarn production, the Government determined the operating level of each rayon yarn manufacturer. (Doc. 3005).

*Government Participation in Obtaining and Retaining a Labor Force at the Facility and in Constructing Housing for that Labor Force.*

109. By October 1942, the War Manpower Commission ("WMC") had informed the WPB that the local labor supply in the Front Royal area would be inadequate to meet future needs for additional workers at the Facility. (Doc. 2009, pp. 6–7).

110. The Government took a number of significant actions to reduce or eliminate labor shortages at the Facility, including directing individuals to report to the Front Royal Facility. (Docs. 3021, pp. 1–2; 3053, p. 6; 5020, p. 2. For example, the Government directed several lead burners to report to the Facility. (Doc. 5025, p. 3).

111. The Government also obtained labor for the Facility by setting mandatory restrictions on the number of employees at surrounding plants in the Front Royal area that were producing non-essential materials. These manpower limitations or "manpower ceilings" often were set below the number of existing employees and may have required the firing of employees. (Docs. 3053, p. 6; 5022, p. 2).

112. To ensure the retention of personnel at the Front Royal Facility, the WMC and the Army actively sought and obtained draft deferments for personnel at the Facility. (Docs. 4037; 4040; 4042A; 5014, p. 4; 5032, p. 8; 5038).

113. The Government assigned a "team" of Army officers to the Facility, whose purpose was to go to Local draft boards when requests for deferments were made and to substantiate those requests. (Doc. 5035, p. 3).

115. The Government further participated in obtaining and retaining personnel at the Facility by providing housing, both

temporary and permanent. (Docs. 4025, p. 2; 4028A; 4029, p. 5; 4031, p. 3; 4085A; 4086; 5041A; 5042; 5044).

116. The Government actively sought out the provision of essential community facilities and services necessary in the recruitment and maintenance of a stable labor force. (Docs. 4064, p. 3; 4068).

117. The Government participated in managing and supervising employees at the Facility. (Docs. 5001; 5020, p. 2; 5022, pp. 1, 3–6; 5029, p. 1). The WPB sent Government employees to the Facility to assist management in cutting down on absenteeism and to resolve disciplinary problems. (Docs. 5029, 5001, 5020, p. 2; 5022).

118. Government personnel visited the Facility to investigate and resolve problems involving worker productivity. (Docs. 5001; 5029, p. 1; 5029A, p. 2; 5035, p. 3; 5040, p. 4; 5044, p. 1).

119. The Government participated in the resolution of labor disputes at the Facility. (Docs. 4038; 4040, p. 1; 4042, p. 3; 4059; 4095A, p. 2; 5029, p. 1).

120. In May 1944, the WPB appointed a full-time representative from its Richmond field office to reside at Front Royal to address problems at the Facility concerning manpower, housing, community services and other related matters. (Doc. 4070, p. 12).

121. While the Government did not actually "hire" American Viscose employees, it was obligated to reimburse American Viscose for the salaries of certain employees under the 1944 Lease between DPC and American Viscose (Doc. 4024A, p. 3) and Amendment 1 to that Lease. Condition Three of Amendment 1 (Doc. 4073A, p. 2) states:

*The Defense Plant Corporation will reimburse the Lessee for salaries and travelling expenses of its non-manual employees engaged in engineering, accounting, clerical, etc. functions of the project.*

### Government On–Site Presence at the Facility.

122. Once the WPB determined that there was a need for substantial expansion of the production capabilities at the Facility, Government personnel were assigned to facilitate and expedite construction. (Docs. 3078, pp. 4–9; 4028A, p. 4).

123. These Government personnel were responsible for reviewing progress in construction and identifying and resolving bottlenecks in equipment delivery, shortages of raw materials, labor availability and any other areas which were causing delays in project completion. (Docs. 4039, pp. 1, 4; 4070, pp. 11–13; 4072B).

124. The Facility's expansion program encountered several serious problems which caused significant delays in the completion of the project. Chief among these problems was the inability to secure timely delivery of equipment and construction materials and the inability to secure an adequate, reliable labor force. (Docs. 4022, pp. 1–2; 4028A; 4028B, pp. 7–8; 4080A, pp. 3–6).

125. As a result of these problems, the WPB, recognizing the need for extraordinary action, began staffing its regional offices with textile personnel qualified to operate in the field, at the actual site of production. (Docs. 4027; 4028B, p. 7; 4053, p. 11; 5029, p. 3).

126. Despite these efforts, delays in project completion continued and the WPB assigned a full-time representative from its Richmond field office to reside at Front Royal. (Doc. 4070, p. 12).

127. In addition to the full-time WPB site representative, personnel from the Army Service Forces were assigned to the Front Royal Facility for the purpose of solving persistent labor problems. (Docs. 5029A, p. 2; 5035, p. 3; 5040, p. 4).

128. The DPC entered into a contract with Rust Engineering which provided that the DPC would designate an on-site representative with responsibility for overseeing and supervising the implementation of that part of the expansion program at the Facility which was paid for and owned by the Government. (Doc. 4041F, p. 10).

129. The DPC on-site representative had extensive responsibilities and authori-

ties, including the right to promulgate rules governing all operations at the work site and the right to require the removal of workers who were unqualified or guilty of improper conduct. (Doc. 4041F, p. 10).

130. The DPC on-site supervising engineer exercised significant responsibilities concerning the purchase, construction and installation of certain machinery and equipment needed to implement the required plant expansion and had extensive hands-on involvement with this project. (Docs. 4041E, pp. 1–2; 4076C; 4089D; 5024A; 5030C; 5041B; 6000C).

131. Representatives of the WPB made periodic site visits to the Facility to review the volume of rayon yarn production and to determine whether any problems required Governmental intervention. (Docs. 3097; 5022, pp. 1, 3–6; 5029, p. 1; 5029A, p. 2).

132. Through continuous informal contacts and communications, as well as through formal contracts and communications, the Government was directly and substantially involved with the Facility's production activities and management decisions.

*Government Involvement in Developing and Providing Specifications for High Tenacity Rayon Yarn and in Requiring the Disclosure of Confidential Information to Other Producers and to the Government.*

133. In October and November 1942, the Government approached several tire manufacturers and asked them to formulate specifications for high tenacity rayon yarn. (Docs. 2012B; 2012D; 2013B).

134. After a series of meetings between the Government and tire manufacturers, specifications were approved by the War Department and provided to rayon manufacturers. (Docs. 2014A; 4055, p. 79).

135. Specifications for the high tenacity rayon yarn that was to be produced at the Facility, therefore, were developed at the Government's insistence and direction and were subject to the Government's approval. (Docs. 2012D; 2014A; 3123, p. 1; 4055, p. 79).

136. In the summer and fall of 1943, the Government became increasingly concerned about the production of "substandard" yarn by some rayon producers, not including American Viscose. (Docs. 3016C; 3078, p. 4; 3126, p. 3; 4055, p. 79).

137. To correct this problem, the WPB requested and obtained an antitrust exemption from the Department of Justice (Docs. 3113, 3115; 4003; 4013, p. 6) and "formally requested" manufacturers of high tenacity rayon yarn to collaborate in the exchange of technical information concerning high tenacity rayon yarn and the equipment, manufacture and testing thereof. (Docs. 3013, p. 4; 3079, p. 1; 3100, p. 2; 3113; 3115; 4056, p. 1; 4059D, p. 3; 5053, p. 14).

139. The Government organized and presided over a committee which had the purpose of accomplishing the exchange of technical information. (Docs. 3109, 3124; 4019; 4028B, pp. 8–9; 4041, pp. 1–2).

140. American Viscose disclosed technical and confidential information to the Government.

141. The WPB made the exchanged technical information available to tire manufacturers and to the Armed Forces. (Docs. 3109, p. 1; 3113; 3123; 3124, pp. 1, 9; 5001B, p. 38).

*The Government Defined and Controlled the Market and End Uses of High Tenacity Rayon Yarn Produced at the Facility.*

142. The principal order issued by the WPB controlling the sale and delivery of high tenacity rayon yarn was General Preference Order M–37–D ("Order M–37D"). (Doc. 3001E).

143. Order M–37D brought high tenacity rayon yarn under allocation, prohibited producers of such yarn from selling or delivering that yarn except to a person who was authorized by the WPB to receive delivery and required each producer of such yarn to complete and file a monthly report relating to such sales and deliveries. (Docs. 2012A, p. 1; 3001E; 3013A; 3133, p. 2; 4055, pp. 15; 5043, pp. 4–8).

144. General Conversation Order M–356 governed rayon, including high tenacity

rayon yarn, in order respects. (*E.g.* Doc. 5019, pp. 7–9).

145. The control by the WPB extended not only to the destination of the high tenacity rayon yarn, but also in what particular products the yarn could be used and the sequence in which the yarn could be used in those products. (Docs. 2016; 3003; 3004A; 3012B; 3013A; 3033; 3086; 3090C; 3098, pp. 4–5; 31171; 3121; 4077. p. 1; 4086A; 6000; 9828).

146. Persons to whom high tenacity rayon yarn was allocated by the WPB were expressly instructed to consume that yarn in a specified order of preference. (Docs. 3070A; 9828).

147. The WPB totally defined and controlled the market and end uses of high tenacity rayon yarn produced at the Facility.

*The Government Controlled the Price of the High Tenacity Rayon Yarn produced at the Facility and the Profit of the Facility.*

148. In December 1942, the Office of Price Administration ("OPA") established a maximum or "ceiling" price on high tenacity rayon yarn. (Docs. 2015A; 3001, p. 6).

149. This ceiling price applied to the high tenacity rayon yarn produced at the Facility.

150. No producer, including American Viscose, charged less than the established ceiling price.

151. The "cost data" on which the OPA based the ceiling price for high tenacity rayon yarn was subsequently criticized in an internal WPB memorandum as showing cost before income or profits taxes and as making only partial provision for amortization of conversion costs. (Doc. 3001, pp. 6–7).

152. Despite drastic fluctuations in the cost of production as a result of numerous expansions and conversions, the ceiling price established by the OPA for high tenacity rayon yarn remained rigidly in effect on all yarn produced at the Facility from December 1942 until the end of the War. (Docs. 3001, pp. 6–7; 3072A, pp. 3–4; 4081; 5040, pp. 1–2).

153. Although a mechanism existed by which a producer could file an appeal to the OPA seeking an exception to the applicable ceiling price, those appeals and exceptions were slow and minimal.

154. The Government controlled the amount of profit that American Viscose could make and retain by establishing the price at which American Viscose could sell its product. (Docs. 4081; 4104).

155. The Government further controlled the amount of profit that American Viscose could make and retain by levying an Excess Profits Tax.

156. The Government had the right to renegotiate the price of any contract or subcontract involving the Government in excess of $100,000, where in its opinion excessive profits were likely to be realized, pursuant to the Sixth Supplemental National Defense Appropriation Act of 1942. ch. 247, § 403, 56 Stat. 226, 245. (1942). As such, the Government was further able to control the amount of profit that American Viscose could make and retain.

157. There were no significant "for profit business decisions" that the Government left to American Viscose.

*The Government Required and Received Extensive Information Relating to Virtually All Aspects of the Facility.*

158. American Viscose was required to submit to the Government, on a regular basis, information relating to production at the Facility, including the amount of high tenacity rayon yarn produced, the amount shipped, the amount of inventory or stockpiling and the amount of controlled materials that were used in the production of the yarn.

159. The WPB received comprehensive monthly reports prepared by WPB personnel concerning the tire cord program and the Facility, which reports were prepared at the direction of the WPB Operations Vice Chairman (Doc. 3078, pp. 1, 7, 9) and contained extensive information concerning the Facility, including the status of the conversion and expansion projects, the obtaining of required equipment, the raw materials that were required and the methods

of obtaining those materials, the labor that was required and the methods of obtaining that labor, the building of housing for labor, the interchange of technical information among the producers of high tenacity rayon yarn, the cost of producing the yarn, the price at which the yarn could be sold, the evaluation of various departments of American Viscose and the involvement and activities of representatives of the WPB and other Government agencies at the Facility (e.g., Docs. 4013;; 4016; 4036; 4053; 4070; 4083; 4087; 4092; 4095; 4108; 5006; 5014; 5024; 5030; 5034; 5035; 5036A; 5040; 5046; 5051; 5053).

160. Substantial, additional information concerning the Facility was obtained by personnel of the WPB and other Government agencies while actually at the Facility. (Doc. 4080A). In numerous instances, the information that was obtained at the Facility was communicated to other WPB personnel by memoranda or other reports. (E.g., Docs. 3097; 5022, pp. 5–6; 5029).

161. The extensive amount of information concerning virtually all aspects of the Facility that was required and received by the WPB and other Government agencies establishes the great interest and involvement of the Government in the rayon tire cord program and the Facility.

162. The rayon tire cord program, in general, and the implementation of the program at the Facility, in particular, required and received far more involvement, participation and control by the Government than the vast majority of the production programs implemented during World War II.

*The Government's Knowledge That the Disposal or Treatment of Hazardous Substances Was Inherent in the Manufacture of High Tenacity Rayon Yarn and That Its Production Requirements Caused a Significant Increase in the Amount of Hazardous Substances Generated and Disposed of at the Facility.*

163. The disposal of treatment of hazardous substance is inherent in the production of high tenacity rayon yarn. (Almy Dep., pp. 60, 66–67).

164. The production of high tenacity rayon yarn at the Facility during the War generated large amounts of hazardous substances requiring disposal. (Almy Dep., p. 66).

165. The Government was familiar with the Facility's process for producing high tenacity rayon yarn. (Docs. 2005, apps. A–C; 3009A, p. 1; 3046; 3097).

166. As part of its initial efforts to increase high tenacity rayon yarn production, the WPB identified the specific type and amount of chemicals necessary to achieve stated production goals. (Docs. 1004A, p. 1; 2001, pp. 7–8; 1005, pp. 22, Table VIII; 4061, p. 3).

167. Once the WPB determined that a 57 million pound per year expansion was necessary at the Facility, WPB engineers thoroughly reviewed final design and engineering plans to assure minimum use of critical materials. The performance of this "stripping" function required a comprehensive understanding of the high tenacity rayon yarn production process. (Docs. 3019, pp. 1–9; 3053).

168. Among the equipment and machinery purchased by the DPC for the expansion program at the Facility were (1) spinning machines and related piping, (2) viscose waste trucks or "buggies" which were used to haul viscose waste from the production machinery to large dump trucks for eventual disposal in the basins, (3) slashing equipment and (4) piping, solution circulation systems and other equipment utilized in the reclamation/disposal system for sulfuric acid. (Doc. 6006, pp. 8–11).

169. Government personnel, some with backgrounds in rayon yarn manufacturing, were on site at the Facility throughout the War and had responsibilities for monitoring production and expediting construction of the expansion program and supervising the work associated with the Government-owned portion of that program. (Docs. 4027; 4028B, p. 7; 4041F, p. 10; 5029, p. 3).

170. During the period that Government personnel were present at the Facility, there was a large amount of highly visible waste disposal activity. (Almy

Dep., p. 66; Leadman Dep.,[3] pp. 31–32; Doc. 103).

171. Wastes were disposed of in large unlined basins located on site. As waste basins were filled, new ones were dug. (Almy Dep., pp. 65–66).

172. Portions of the sulfuric acid utilized in the production process which could not be reclaimed or treated at the Facility were disposed of in the on-site waste basins as was carbon bisulfide and zinc contaminated waste. (Almy Dep., pp. 55–56, 59–60).

173. From 1942 through 1945, at least 65,500 cubic yards of viscose waste were disposed of in the on-site basins. (Doc. 103).

174. The disposal basins were easily visible from the Facility and any person visiting the Facility on a daily or weekly basis could easily have seen these basins. (Almy Dep. 65–66).

175. The huge increase in waste disposal during the War required continuous digging of new basins all of which was done in plain view of any person at the Facility. (Almy Dep., 66; Leadman Dep., pp. 31–32).

176. The huge increase in the production of high tenacity rayon yarn at the Facility during the War caused a significant increase in the amount of hazardous substances generated and disposed of at the Facility.

177. Since the generation of waste was inherent in the production of high tenacity rayon yarn, increased production automatically increased waste. (Almy Dep., pp. 60, 66–67).

178. Governmental pressure to maximize production overtaxed the machinery and equipment at the Facility which increased the amount of material that had to be scrapped and disposed of in the waste basins. (Almy Dep., pp. 56–57; Leadman Dep., p. 29).

179. Recurring manpower shortages interfered with the proper staffing of the high tenacity rayon yarn production machinery, which led to an increase in the amount of material that had to be disposed of at the Facility. (Leadman Dep., pp. 28–29).

180. High tenacity rayon yarn required strict adherence to production specifications, which resulted in an increase in the amount of product rejected for use by upstream manufacturers which was disposed of in the waste basins. (Almy Dep., pp. 68–69). Employee attendance problems as well contributed to the production of unusable rayon and the disposal of more hazardous waste, as there were not enough employees to handle production. Excess acid therefore was disposed of during the preliminary and mid-stages of production.

181. Wastes were generated and disposed of by the Government-owned equipment which was installed at the Facility during the War to meet the Government's increased high tenacity rayon yarn production requirements.

182. The Government knew or should have known that the disposal or treatment of hazardous substances was inherent in the manufacture of high tenacity rayon yarn and that its production requirements caused a significant increase in the amount of hazardous substances generated and disposed of at the Facility.

## II. CONCLUSIONS OF LAW:

1. Defendants Department of Commerce, Secretary of Commerce Robert Mosbacher and The United States of America, as well as the WPB, DPC and RFC, are "persons" as defined by section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

2. Defendants Department of Commerce and Secretary of Commerce Robert Mosbacher are successors to the WPB.

3. Defendants Department of Commerce and the Secretary of Commerce and The United States of America are departments, agencies and instrumentalities of the United States Government within the meaning of section 120(a)(1) of CERCLA, 42 U.S.C. § 9620(a)(1).

---

3. References to the Deposition of Charles Lead-man are in the form "Leadman Dep., p. __."

4. The Facility is a "facility" as defined by section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

5. The installations, equipment, pipes and/or pipelines owned by the United States through the DPC and RFC are "facilities" as defined by section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

6. The United States, through the actions and authority of the WPB and other departments, agencies and instrumentalities of the United States Government, "operated" the Facility, from approximately January 1942 to at least November 1945, as defined by section 101(20) of CERCLA, 42 U.S.C. § 9601(20), and within the meaning of section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

7. During the period the Government operated the Facility, wastes containing "hazardous substances," as defined by section 101(14) of CERCLA, 42 U.S.C. § 9601(14), and as identified in 40 C.F.R. Part 302, Table 302.4 (1990), were "disposed of" at the Facility, as defined in section 101(29) of CERCLA, 42 U.S.C. § 9601(29), and within the meaning of section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

8. The United States, through the DPC and the RFC, was an "owner" of facilities at the Front Royal Facility from at least February 1944 to at least March 1948, as defined by section 101(20) of CERCLA, 42 U.S.C. § 9601(20), and within the meaning of section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

9. At the time the United States was an owner of facilities at the Front Royal Facility, wastes containing "hazardous substances," as defined by section 101(14) CERCLA, 42 U.S.C. § 9601(14), and as identified in 40 C.F.R. Part 302, Table 302.4 (1990), were "disposed of" at those facilities, as defined in section 101(29) of CERCLA, 42 U.S.C. § 9601(29), and within the

meaning of section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

10. The United States "arranged for the disposal or treatment of hazardous substances" at the Facility, as those terms are defined by sections 101(14) of CERCLA, 42 U.S.C. § 9601(14), and 101(29) of CERCLA, 42 U.S.C. § 9601(29), and as identified in 40 C.F.R. Part 302, Table 302.4 (1990), and within the meaning of section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

11. Defendants are within the classes of liable parties under section 107 of CERCLA, 42 U.S.C. § 9607.

12. There has been a "release or threatened release" of hazardous substances from the Facility as defined by section 101(22) of CERCLA, 42 U.S.C. § 9601(22), and within the meaning of section 107 of CERCLA, 42 U.S.C. § 9607.

13. There has been a "release or threatened release" of hazardous substances from facilities which were owned by the United States through the DPC and RFC as defined by section 101(22) of CERCLA, 42 U.S.C. § 9601(22), and within the meaning of section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4).

14. Such release or threatened release of hazardous substances has caused and will continue to cause FMC to incur "necessary costs of response" within the meaning of section 107 of CERCLA, 42 U.S.C. § 9607, including without limitation the costs which FMC has incurred and will continue to incur in monitoring, assessing and evaluating the release or threatened release of hazardous substances and performing removal and/or remedial activities and taking other actions required or requested by the EPA, as well as attorneys fees and expenses associated with this lawsuit.

15. Liability of an owner or operator of a facility as defined by § 107(a) for the cost of removal "is strict[4] and joint and several.[5]" *U.S. v. Kayser–Roth Corp., Inc.,* 910

---

4. See e.g., *Dedham Water Company v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146, 1150 (1st Cir.1989) (Dedham II); *New York v. Shore Realty,* 759 F.2d 1032, 1042 (2d Cir.1985) [reviewing cases and legislative history].

5. See e.g., *O'Neil v. Picillo,* 883 F.2d 176, 178–79 (1st Cir.1989) *cert. den.,* 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990).

F.2d 24, 26 (1st Cir.1990). Defendants, therefore, are jointly and severally liable for the costs that FMC has already incurred and will in the future incur in responding to such release or threatened release of hazardous substances.

AND IT IS SO ORDERED.