The CHESAPEAKE AND POTOMAC
TELEPHONE COMPANY OF
VIRGINIA, Plaintiff,

v.

PECK IRON & METAL CO.,
INC. et al., Defendants.

Civ. A. No. 92–CV–506.

United States District Court,
E.D. Virginia,
Richmond Division.

Dec. 24, 1992.

Richard Kent Bennett, Shawn Renea Urelius Jordanger, Betty Sinclaire Wommack, McSweeney, Burtch & Crump, Richmond, VA, for plaintiff.

Archibald Wallace, III, Sands, Anderson, Marks & Miller, Richmond, VA, for defendant Peanut City Iron & Metal, Inc.

Robert L. Harris, Jr., Hirschler, Fleischer, Weinberg, Cox & Allen, Richmond, VA, for defendant Goldsboro Iron & Metal Co.

A.J. Owings, Spinella, Owings & Shaia, Richmond, VA, for defendant Smith Iron & Metal Co., Inc.

John D. Epps, LeClair, Ryan, Joynes, Epps & Framme, Richmond, VA, for defendant Ramsey Iron & Metal, Inc.

W. Todd Benson, Press, Jones & Waechter, P.C., Richmond, VA, for defendant Phillip F. Gay, t/a Farmville Iron & Metal Co.

William Riley Marchant, Thorsen, Page & Marchant, Richmond, VA, for defendants Zacharias Bros., a Virginia General Partnership, Carol K. Zacharias, Edward A. Zacharias, Mary D. Zacharias, William K. Zacharias.

Susan Taylor Hansen, Cooper, Spong & Davis, Portsmouth, VA, for defendant Virginia Iron & Metal Co. of Portsmouth, Inc.

Joy J. Hatchette, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, MD, for defendant Irving Hurwitz.

Madelaine Berg, Stroock, Stroock & Lavan, New York City, for defendant Peck Iron & Metal Co., Inc.

Winthrop A. Short, Jr., David Owens, Kaufman & Canoles, Norfolk, VA, for defendant Gutterman Iron & Metal Corp.

Patrick A. Genzler, Carter T. Gunn, Vandeventer, Black, Meredith & Martin, Norfolk, VA, for defendant Smith Iron & Metal Co., Inc.

## MEMORANDUM·OPINION

RICHARD L. WILLIAMS, Senior District Judge.

This matter is before the Court on: 1) the Plaintiff's Motion for Partial Summary Judgment on Joint and Several Liability; 2) the Zacharias Defendants' Cross–Motion for Summary Judgment; and 3) Defendant Phillip Gay's Motion for Summary Judgment. For the reasons set forth below, the Court grants the Plaintiff's motion and imposes joint and several liability upon the defendants to this motion, but only for those response costs *not* attributable to the Plaintiff. At the contribution phase of this proceeding, the Court will, as a first cut at apportioning liability, determine a "Plaintiff's share" and a "Defendants' share." The defendants will be jointly and severally liable for the Defendants' share *only.* Furthermore, the motions for summary judgment brought by Phillip Gay and the Zacharias Defendants are denied.

## I.  FACTS

### A.  C & R Battery Company

From 1971 until mid–1985, when it ceased operations, C & R Battery Company ("C & R Battery") operated a battery sawing and shredding facility designed to recover lead from discarded auto, truck and other large commercial batteries.  C & R Battery leased the land on which it operated the business from Zacharias Brothers, a Virginia general partnership composed of Edward A. Zacharias and William K. Zacharias, during the period 1973 to mid–1985.  C & R Battery also used a piece of land owned at one point by Zacharias Brothers and now owned by Edward A. Zacharias, William K. Zacharias, Mary D. Zacharias and Carol K. Zacharias.

C & R Battery purchased bulk shipments of spent lead acid batteries for recycling from the defendants to this motion,[1] as evi-

---

[1]. The plaintiff refers to these defendants as the "generator defendants;" they refer to themselves as the "recycler defendants."  To appease all involved, the Court will call them the "genera-tor/recycler defendants."  Specifically, they are: Peck Iron & Metal Co., Inc.; Smith Iron & Metal Co., Inc.; Irving Hurwitz; Peanut City Iron & Metal Co., Inc.; Virginia Iron & Metal Co. of

denced by a variety of documents, including receiving reports, statements, cancelled checks and other miscellaneous purchasing documents. According to the affidavit of Charles L. Guyton ("Guyton"), former president of C & R Battery, the batteries purchased from these defendants were shipped to the C & R Battery Site on Bellwood Road in Chesterfield County, Virginia, where they were broken in accordance with C & R Battery's normal operating procedure. The defendants, throughout the relevant time period—1971 through mid–1985—engaged in the scrap metal business. They purchased or acquired lead acid batteries, among other items, for purposes of resale and recycling. Typically, these defendants accumulated batteries until a commercially reasonable quantity existed to make a sale to a battery reclaimer like C & R Battery. After the batteries left their premises, the defendants had no further involvement in the recycling process.

As the batteries were broken, C & R Battery employees drained the lead acid into an acid pond, removed the lead plates and stored the plates on-site until they were sold to a secondary lead smelter. (Guyton Aff., paras. 3 and 7). Composite soil samples taken from the Site recently indicate that lead is present in the soil at the Site at levels of 40,000 mg/kg. (Affidavit of Jeffrey W. Moore, Project Engineer/Environmental for Geraghty & Miller ["Moore Aff."], para. 10).

### B. *Regulatory Action at C & R Battery*

The Virginia State Water Control Board ("SWCB") began monitoring the C & R Battery Site for lead contamination in the late 1970s, and continued conducting soil, groundwater and surface water tests through 1986. The results of the tests conducted by the SWCB showed elevated levels of lead in the soil. (Administrative Order at 7). In 1983, the Virginia Occupational Safety and Health Administration ("VA OSHA") inspected the site and determined that the breathing zone contained lead in concentrations well in excess of acceptable levels. (*Id.* at 8).

"On February 24, 1986, [the Environmental Protection Agency's] ("EPA") Field Investigation Team ("FIT") conducted a Site Investigation of local groundwater, surface water and soil contamination. On-site soil samples revealed levels of lead as high as 63,000 mg//kg." (*Id.*). In the summer of 1986, in response to health concerns, EPA conducted a removal action in which it verified that the soil was contaminated with elevated levels of lead and other metals. EPA then took actions to contain the contamination on the Site, including moving contaminated debris back onto the Site and installing a six-foot high chain-link fence around it. (*Id.* at 8–9). In August 1988, EPA began conducting a Remedial Investigation/Feasibility Study (RI/FS) for the Site. As a result of that study, EPA concluded that there were significant concentrations of lead on the Site at above-action levels. (*Id.* at 9–11).

On March 27, 1992, after a six-year investigation, EPA Region III issued an Administrative Order under 42 U.S.C. § 9606 requiring Plaintiff, C & P Telephone Company of Virginia ("C & P"), and 16 other potentially responsible parties, jointly and severally,[2] to assume responsibility for cleaning up the Site. Of the 17 recipients, only C & P eventually agreed to comply with the Order. C & P, of course, is far from an innocent and noble volunteer. Failure to comply with an Administrative Order issued pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") carries a penalty of up to $25,000 per day plus punitive damages. 42 U.S.C. §§ 9606(b)(1), 9607(c)(3). C & P sold a significant amount of batteries to C & R Battery, and appears to be one of the largest contributors to the Site.

Portsmouth, Inc.; Goldsboro Iron & Metal Company; W.S. Fogg; Ramsey Iron & Metal, Inc.; Gutterman Iron & Metal, Inc.; Zacharias Brothers, a Virginia general partnership; Carol K. Zacharias; Edward A. Zacharias; Mary D. Zacharias; and William K. Zacharias. The Court's ruling on C & P's motion affects the rights and liabilities of these parties only.

2. The Order provides: "Respondents are jointly and severally responsible for implementing all of the requirements of this Order. The success or failure by any one of the Respondents to comply with all or part of this Order shall not in any way excuse or justify noncompliance by the other Respondents." (Administrative Order at para. II.F.).

## C. *Remedial Activities*

As of April 28, 1992, C & P assumed sole responsibility for cleaning up the Site in accordance with the Administrative Order. By contract dated April 27, 1992, C & P hired Geraghty & Miller to serve as the Project Coordinator and Supervising Contractor for the remedial work to be done at the site. (Moore Aff., para. 4). EPA approved the selection of Geraghty & Miller to act as the Project Coordinator and Supervising Contractor by letter dated May 14, 1992.

After competitive bidding, and upon Geraghty & Miller's recommendation, C & P retained Laidlaw Environmental Services (FS), Inc. ("Laidlaw") to serve as the Remedial Action Contractor, a selection of which EPA also approved by letter dated August 24, 1992. Geraghty & Miller then assisted C & P in negotiating the parameters of Laidlaw's work, which allegedly conforms to the requirements of the Administrative Order and the specific requirements of the final design approved by EPA. (Moore Aff., para. 6). Geraghty & Miller is providing continuing oversight of the Laidlaw work at the Site to ensure compliance with the Administrative Order. To date, C & P has incurred $354,-433.29 in remedial costs. (Moore Aff., para. 9).

## D. *Section 107 Action*

On August 5, 1992, C & P filed a private cost recovery action under CERCLA, 42 U.S.C. § 9607(a), against 139 defendants (some of which have since been voluntarily dismissed) alleging that each defendant is jointly and severally liable to C & P for all response costs consistent with the National Contingency Plan (NCP) that it has and will incur in cleaning up the Site. C & P has moved the Court for partial summary judgment on the issue of joint and several liability against the facility owners and certain generator/recycler defendants. Defendants Zacharias Brothers, Edward A. Zacharias, William K. Zacharias, Mary D. Zacharias and Carol K. Zacharias (the "Zacharias Defendants") have filed a cross-motion for summary judgment against C & P, alleging an entitlement

to the "innocent landowner" affirmative defense. Defendant Phillip Gay has filed a separate motion for summary judgment against C & P, contending that the recycling activities in which it engaged did not constitute "arranging for the disposal or treatment" of hazardous material and, thus, that it is not liable under CERCLA.

## II. ISSUES PRESENTED

A. The generator/recycler defendants have claimed that they are not "covered persons" under CERCLA because they claim to have sold a valuable commodity—batteries—for recycling, as opposed to arranging for their disposal or treatment. Is this a meritorious defense?

B. The generator/recycler defendants have raised disputed issues of fact with respect to the "necessity" and "consistency with the NCP" of the response costs incurred by C & P. The question is whether, on the facts of this case, these disputes are relevant to determining the *fact* of liability, or whether they will be germane only to the contribution phase of this lawsuit.

C. The generator/recycler defendants and the United States[3] have argued that because C & P is also a potentially responsible party ("PRP") under CERCLA, it is not an appropriate plaintiff in a Section 107 response cost recovery action. Instead, they argue, C & P is only entitled to bring a Section 113 contribution action against the defendants, in which joint and several liability is not available. Is this argument correct?

D. Is the harm at the site "indivisible," such that C & P is entitled to *joint and several* liability—if C & P is indeed properly proceeding under Section 107, as opposed to 113, of CERCLA?

E. Are the Zacharias Defendants entitled to the "innocent landowner" defense under CERCLA?

---

**3.** Although the United States is not a party to any of the current motions before the Court, it nonetheless submitted a brief opposing C & P's motion for partial summary judgment.

## III. LEGAL STANDARDS

When a motion for summary judgment is filed, Fed.R.Civ.Proc. 56(c) provides that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A fact is material if proof of its existence or nonexistence would affect the outcome of the case, and an issue is a genuine one if a reasonable jury might return a verdict in favor of the non-moving party on the basis of such issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Of course, the Court remains mindful that *all* factual and legal disputes need not be resolved at this stage of the case—only those germane to the issue of joint and several liability against the defendants named in this motion:

> Because of the complexity of CERCLA cases, which often involve multiple defendants and difficult remedial questions, courts have bifurcated the liability and remedial, or damages, phases of CERCLA litigation. In doing so, disputed factual and legal issues pertaining *only to liability* are resolved before deciding the more complicated and technical questions of appropriate cleanup measures and the proportionate fault of liable parties. Bifurcation and the use of summary judgment provide efficient approaches to these cases by narrowing the issues at each phase, by avoiding remedial questions if no liability attaches, and by potentially hastening remedial action or settlement discussions once liability is determined.

*Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 667–68 (5th Cir.1989) (citations omitted) (emphasis added).

## IV. ANALYSIS

### A. Are the Generator/Recycler Defendants "Covered Persons" Under CERCLA? [4]

To establish a prima facie case of liability in a CERCLA cost recovery action, a plaintiff must prove: (1) that the site in question is a "facility" as defined in 42 U.S.C. § 9601(9); (2) that the defendant is a responsible person under § 9607(a);[5] (3) that a release or threatened release of a hazardous substance has occurred; and (4) that the release or threatened release has caused the plaintiff to incur response costs. *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152–53 (9th Cir.1989). If the plaintiff establishes each of these elements and the defendant is unable to establish the applicability of one of the defenses listed in § 9607(b),[6] the plaintiff is entitled to summary judgment on the liability issue. *Amoco*, 889 F.2d at 668. This is true even when genuine issues remain regarding the apportionment of damages among responsible parties. *Id.*

C & P's ability to prove prongs 1, 3 and 4 of its prima facie case is unchallenged by the generator/recycler defendants—the Site is a facility within the meaning of CERCLA; a "release" of a hazardous substance has occurred at the Site; and C & P has incurred response costs as a result of that release.

---

4. The Court's resolution of this issue will effectively decide Phillip Gay's Motion for Summary Judgment also pending before the Court.

5. Four classes of persons are subject to CERCLA's liability provisions:

   (1) the owner and operator of a vessel or facility,
   (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
   (3) any person who by contract, agreement, or otherwise arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
   (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person....

   42 U.S.C. § 9607(a)(1)–(4).

6. To establish a defense to liability, a defendant must prove, by a preponderance of the evidence, that the release or threat of release of a hazardous substance and the resulting damages "were caused solely by—(1) an act of God; (2) an act of war; [or] (3) an act or omission of a third party...." 42 U.S.C. § 9607(b).

The defendants dispute C & P's "Prong 2" allegation that they are responsible parties under CERCLA because they "arranged for the disposal or treatment" of hazardous materials contained within the batteries which they sold to C & R Battery. *See* 42 U.S.C. § 9607(a)(3).

▆ The generator/recycler defendants argue that the sale of spent lead acid batteries to a lead reclamation operator for recycling does not constitute an arrangement for disposal or treatment. They contend specifically that "the mere sale of raw materials, commodities or products used in another company's manufacturing processes, generally does not constitute 'arranging for disposal.' The Recycler Defendants sold useful, valuable material to C & R Battery ..." (Recycler Defs.' Mem. at 8).

This argument is without merit; the generator/recycler defendants are "arrangers for disposal or treatment" within the meaning of 42 U.S.C. § 9607(a)(3). The defendants' attempt to characterize their sales of spent lead acid batteries to a battery breaking and lead reclamation outfit so that they fit within the "useful product" line of CERCLA cases is untenable. If the defendants had sold unused, and still usable, batteries to an entity which used them in their business operations and then drained battery acid and lead from them—causing damage to the environment—their argument would be meritorious. But the only remaining "use" of the batteries sold by the generator/recycler defendants to C & R Battery was that lead, a hazardous substance, could be reclaimed from them. As batteries, per se, they had no use. The law provides that CERCLA liability may not attach if a transaction involves the "sale of a *new useful* product containing a hazardous substance, as opposed to the sale of a substance merely to 'get rid of it.'" *Prudential Ins. Co. v. United States Gypsum*, 711 F.Supp. 1244, 1254 (D.N.J.1989) (citations omitted) (emphasis added). Defendants cite no case which supports the proposition that, merely because a hazardous substance could

still be reclaimed from an otherwise deceased product, that the otherwise dead product was "new and useful" such that CERCLA liability would not attach if the product was sold to an operation which broke the product open and reclaimed the hazardous substance in a manner which harmed the environment. The batteries were dead; their sale to C & R Battery can only realistically be characterized as an attempt to "get rid of them."

The validity of this conclusion was confirmed by the Western District of Pennsylvania's recent decision in *United States v. Pesses*, 794 F.Supp. 151 (W.D.Pa.1992). In *Pesses*, scrap dealers sold scrap metals and batteries that were no longer usable for their intended purpose to Pesses for metal reclamation—recycling—at the Metcoa Radiation Site. During the reclamation process, hazardous substances were released into the environment, thus contaminating the site. The court held that the sale of scrap materials, including spent nickel cadmium batteries, to a metal reclamation operation constituted an arrangement for disposal or treatment.

The *Pesses* court noted that it was immaterial that the scrap dealers were paid for the scrap and that their intent in selling the scrap material was to make a profit, not to dispose and/or treat hazardous substances. *Id.* at 156–57. As in this case, in *Pesses* the scrap dealers "sent scrap materials which could not be used for their intended purpose, i.e., could not be used productively without processing," to an operator whose business it was to process that scrap for the metals contained within it. *Id.* The scrap dealers were held liable as arrangers because they decided to place the waste into the hands of a facility that contained those wastes. *See id.* at 156 (" '[T]he relevant inquiry [is] *who decided* to place the waste into the hands of a facility that contains hazardous substances.' "). Likewise, in this case, the generator/recycler defendants made the decision to sell spent lead acid batteries to C & R Battery—a facility that contains lead. Thus, they thus arranged for the treatment[7] and

---

7. CERCLA § 101(29) provides that the term "treatment" shall have the same meaning provided in section 1004 of the Solid Waste Disposal Act [42 U.S.C. § 6903]. Under that provision,

"[t]he term 'treatment', when used in connection with hazardous waste, means any method, technique, or process, including neutralization, designed to change the physical, chemical or bio-

disposal of the lead, and fall well within the ambit of Section 107(a).

### B. Do the Disputed Factual Issues Raised by the Generator/Recycler Defendants Concerning the "Necessity" and "Consistency with the NCP" of the Response Costs Incurred by C & P Preclude Imposition of Liability Upon these Defendants at this Stage of the Case?

The generator/recycler defendants contend that C & P has not adequately established the necessity of its response costs nor their consistency with the NCP. This deficiency, the defendants claim, should preclude the Court from awarding summary judgment on liability. In essence, the generator/recycler defendants contend that the EPA did not conduct its investigation of the C & R Battery Site in an appropriate manner. The record indicates that Mr. Robert Caron, who served as an On–Scene Coordinator for the EPA at the Site, pled guilty on June 17, 1992 to one count of making false declarations under oath regarding his professional credentials, in violation of 18 U.S.C. § 1623. The defendants also claim that the EPA did not base its decisions upon a full and fair administrative record and, finally, that the remedy selected by the EPA in its Section 106 Administrative Order is inconsistent with the NCP because of its "lack of cost effectiveness." (Recycling Defs.' Mem. at 26). Thus, the defendants urge the Court to table the liability issue pending a full trial on the merits when these factual disputes can be fully resolved.

The Court rejects the defendants' timetable for resolving these factual issues; it will instead address any challenges to the "necessity" and "consistency" of C & P's response costs during the contribution phase of this case. The record is replete with evidence that convinces the Court beyond any shred of doubt that at least *some* "necessary" and "consistent" response costs have been incurred at the C & R Battery Site. In the very letter from the EPA to counsel for many of the defendants informing them of Mr. Caron's guilty plea, the EPA noted: "Despite the level of Mr. Caron's involvement at the Site, the EPA believes that all response actions performed were consistent with the National Oil and Hazardous Substances Contingency Plan, 40 CFR 300 ("NCP")." (Letter from Hamilton–Taylor to "All Counsel" of June 30, 1992). Furthermore, the federal regulations issued pursuant to CERCLA provide:

> Responsible parties shall be liable for necessary costs of response actions to releases of hazardous substances incurred by any other person consistent with the NCP.
>
> .     .     .     .     .
>
> ii. Any response action carried out in compliance with the terms of an order issued by EPA pursuant to Section 106 of CERCLA ... will be considered "consistent with the NCP."

40 CFR § 300.700(c)(2) and (3). C & P has submitted affidavits demonstrating its compliance with the EPA's Administrative Order, which the defendants have failed to refute in any particular.

This is not a case where a plaintiff has conducted a cleanup without referencing or attempting to comply with federal regulations. *See Channel Master Satellite Systems, Inc. v. JFD Electronics Corp.*, 748 F.Supp. 373, 379–80 (E.D.N.C.1990). This is a case where a plaintiff has presented credible evidence that it is proceeding to clean up what is clearly a contaminated site by following an Administrative Order, issued pursuant to CERCLA § 106, by the EPA. If not all of the response costs are "necessary" or "consistent," the Court is fully prepared to hear that evidence when it tackles the task of apportioning liability among parties deemed responsible.[8]

---

logical character or composition of any hazardous waste ... so as to render such waste ... *amendable for recovery*...." 42 U.S.C. § 6903(34) (emphasis added). As the generator/recycler defendants have admitted, the battery breaking operations at C & R Battery were designed to render the lead in the batteries amendable for recovery. Thus, the language in 42 U.S.C. § 6903(34) indicates that the defen-

dants arranged for *treatment* of the lead they sold to C & R Battery.

8. When the Court resolves the parties' contribution claims by allocating response costs among liable parties using such equitable factors as the Court determines are appropriate, *see* 42 U.S.C. § 9613(f), it will hear evidence from any defendant who wishes to decrease its share of liability

This approach is well within the Court's discretion. *See Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 841 n. 2 (4th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992). While the Court certainly recognizes the validity of the defendants' proposed tact in cases where there is a legitimate question regarding whether *any* recoverable response costs have been incurred, such an approach would needlessly prolong resolution of this case, where it is patent that at least some response costs have been "necessary" and "consistent with the NCP."

### C. Is C & P's Section 107(a) Action Really a Contribution Action in Disguise?

■ Despite defendants' arguments to the contrary, the Court has little difficulty determining that C & P is entitled to bring its claim under Section 107(a), and that this action need not be recast as one solely for contribution, pursuant to Section 113(f) of CERCLA. The Court will, of course, retain jurisdiction over this matter throughout its contribution phase, and will apportion liability in an equitable fashion at that time. There is nothing in the language of the statute, however, that precludes a party, like C & P, itself liable under CERCLA, to initiate cleanup and sue to recover its costs under Section 107.

Nothing in the statute supports the assertion that only the United States Government or an "innocent" plaintiff can bring a cost recovery action under Section 107(a). To the contrary, the statute specifically provides that covered persons shall be liable to both the United States Government, among others, and to "any other person" who incurs response costs:

[Covered persons defined in § 107(a)(1)–(4) ] shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not

inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by *any other person* consistent with the national contingency plan;

. . .

42 U.S.C. § 9607(a) (emphasis added). In the absence of a "clearly expressed legislative intention to the contrary," the language of the statute itself "must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Nothing in the statute indicates that only "innocent" persons fall within the definition of "any other person." Therefore, the Court interprets the term "person" in Section 107 in accord with the definition of that term provided by the statute itself. CERCLA defines "person" as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(21). C & P certainly qualifies.

The Court is in general agreement with the defendants that a plaintiff, like C & P, itself liable under CERCLA, should not benefit from starting the cleanup operation unilaterally and being the first to the courthouse door to sue its confederates in environmental misbehavior. It is, after all, a time-honored principle of the law that a plaintiff should not be permitted to benefit from its own wrongdoing. But the Court addresses this concern not by ignoring the plain language of CERCLA and precluding C & P from maintaining its cost recovery action, but by imposing joint and several liability [9] on the defendants *only* for those response costs that are apportioned to the defendants, as a group, in this case— exclusive of the costs attributable to C & P. At the contribution phase of this proceeding, the Court will, as a first cut at apportioning liability, determine a "Plaintiff's share" and a

---

by demonstrating that a portion of the costs for which it has been held liable are not "necessary" or consistent with the NCP. Such evidence is of no moment, however, in light of the record before the Court, on the issue of liability.

9. The Court imposes joint and several liability because it is clear that the harm in this case is "indivisible." The rationale for this decision is set forth below at Section IV.D. below.

"Defendants' share." The defendants will be jointly and severally liable for the Defendants' share *only*. In this fashion, the Court hopes to prevent C & P from being improperly enhanced because of this lawsuit. C & P will be liable—by itself—for its share of response costs and whatever portion of the "orphan shares" the Court decides to allot to it at the contribution phase of this case. The defendants will be jointly and severally liable only for the non-C & P share of liability.

The Court's decision to permit C & P's cost recovery action finds support not only in the express language of the statute, but the opinions of several other federal courts to tackle this issue. *See FMC Corp. v. United States Dept. of Commerce*, 786 F.Supp. 471, 486 (E.D.Pa.1992) (imposing joint and several liability upon United States defendants in Section 107(a) action brought by owner and operator of contaminated site); *Sand Springs Home v. Interplastic Corp.*, 670 F.Supp. 913, 915–16 (N.D.Okla.1987) (rejecting defendants' argument that joint and several liability does not apply when a responsible party that has incurred response costs brings suit under § 107); *Philadelphia v. Stepan Chem. Co.*, 544 F.Supp. 1135, 1142 (E.D.Pa.1982) (nothing in language, legislative history or environmental objectives of CERCLA preclude a PRP from initiating cleanup and maintaining a private party response cost recovery action under Section 107). As Chief Judge Gerry of the District of New Jersey noted just last year:

> [S]ections 107 and 113 serve distinct purposes. CERCLA was enacted to facilitate cleanup of the tens of thousands hazardous waste sites in this country. Section 107 permits the Government *or a private party* to go in, clean up the mess, pay the bill, then collect all its costs not inconsistent with the NCP from other responsible parties—*even if plaintiff was also responsible for the contamination.*

**10.** The defendants' characterization of C & P's lawsuit as an attempt "to manipulate CERCLA through in terrorem tactics" to force an early settlement by the other PRPs" (Recycler Defs.' Mem. at 37), is of absolutely no relevance to the Court's calculus in deciding whether to impose joint and several liability. *See United States v.*

*United States v. Kramer*, 757 F.Supp. 397, 416 (D.N.J.1991) (emphasis added). The *Kramer* Court noted that whatever windfall a plaintiff PRP might receive by bringing a Section 107 action serves as "an incentive for *private parties* to clean up hazardous waste sites, to risk their own capital initially, knowing that by then prevailing in a section 107 action, they will be reimbursed perhaps in excess of what might be shown in a section 113 action to have been their equitable share." *Id.* at 416–17 (emphasis added). While the Court recognizes the potential value of this incentive, it has nonetheless attempted to minimize the windfall by ruling at this time, in advance of the contribution phase of the lawsuit, that the Plaintiff will not be allowed to recover those costs attributable to its own dumping or the orphan shares allocated to it by the Court. Thus, instead of allowing the Plaintiff to recover *all* of its costs, and then forcing the defendants to recoup some of their money in a contribution action, the Court will streamline this procedure by holding that, at no time, will any defendant have to pay for environmental harm attributable to C & P.

**D.** *Is this a Case of "Indivisible Harm" Such that Imposition of Joint and Several Liability is Warranted?* [10]

The Fourth Circuit has held that "[w]hile CERCLA does not mandate the imposition of joint and several liability, it permits it in cases of indivisible harm." *United States v. Monsanto Co.*, 858 F.2d 160, 171 (4th Cir.1988). In deciding whether liability is joint and several, the Court is guided by the test set forth in the Restatement (Second) of Torts § 433A (1965), which provides:

> (1) Damages for harm are to be apportioned among two or more causes where
>
> (a) there are distinct harms, or
>
> (b) there is a reasonable basis for determining the contribution of each cause to a single harm.

*Monsanto Co.*, 858 F.2d 160, 171 n. 22 (4th Cir.1988) (equitable factors "are not pertinent to the question of joint and several liability, which focuses principally on the divisibility among responsible parties of the harm to the environment").

(2) Damages for any other harm cannot be apportioned among two or more causes. *Monsanto*, 858 F.2d at 172, *quoting*, Restatement (Second) of Torts § 433A (1965). The defendants have not presented any evidence to establish the existence of distinct harms at the Site. Indeed, their emphasis on the fact that only one hazardous substance, lead, has caused the contamination at the Site illustrates that the harms to the Site are not distinct. Thus, the Court's decision regarding the imposition of joint and several liability turns upon whether there is a *reasonable basis* for determining the contribution of each defendant to the harm at the Site.[11]

■ The Court does not quarrel with the defendants' argument that its analysis should be case-by-case and intensely factual. *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 269 (3d Cir.1992). But it strongly disagrees with the defendants that, on the basis of the particular set of facts before it, the harm is reasonably apportionable. While the Court recognizes that volumetric contributions can, in appropriate circumstances, provide a reasonable basis for apportioning liability, *see Monsanto*, 858 F.2d at 172–73 n. 27, they clearly cannot in this case. It is plain that there simply will never be enough evidence in this case from which a *reasonable* volumetric study could be constructed.

C & R Battery operated from 1971 through mid–1985. The only records available to C & P and EPA were incomplete records of battery purchases only during the period 1980 through 1985. (Guyton Aff., paras. 4 and 8). Thus, there are approximately nine years of records relating to battery purchases that are missing and there is no way to account in any reasonable fashion for the types or volumes of batteries broken at the Site during that time period. In addition, as some of the purchasing documents show, the price C & R Battery paid for batteries purchased from the defendants varied almost daily and by significant degrees from month-to-month and year-to-year. The price also varied by customer. Accordingly, in cases where only cancelled checks for battery purchases exist, it is simply not possible to reach reasonable calculations regarding the number or weight of batteries sold simply by the amount of the check.

Furthermore, it is apparent that even if each defendant's *battery* contribution could be determined with any degree of precision, there still would not be a reasonable basis for determining each party's contribution to the *environmental harm*. The receiving reports provided by Guyton show that C & R Battery purchased a number of different types of batteries, including lead acid auto batteries, industrial batteries, golf cart batteries, railroad batteries, telephone batteries, wet batteries and drained batteries. Some batteries might have contained a thimble full of lead, others a tea cup, and others a whole bucket. We will never have any way of knowing. The size of the batteries purchased by C & R Battery during the time period in question varied tremendously as did the price paid per battery or per pound during different time periods. While the *type* of hazardous waste (lead) contained in each battery may have been the same, the volume of lead contributed to the Site by each type of battery obviously would differ from battery to battery.[12] Thus, the Court cannot reasonably divvy up the environmental harm at the C & R Battery Site; the

---

11. The defendants' reliance upon decisions which imposed joint and several in "chemical soup" contexts, where one or more different toxic substances mixed together to create the environmental contamination, are of no real precedential value to the Court. No court has stated that, as a prerequisite to imposing joint and several liability, a court must find that more than one substance contributed to the environmental harm at issue. The key inquiry when there are not distinct harms, according to the Fourth Circuit, is whether a reasonable basis exists for apportioning each contributing party's fair share of the environmental harm at issue.

12. It is also possible that the exact same type of battery manufactured in the early to mid–1970s might not contain the same concentration of toxic substances as one produced in the early 1980s. As battery manufacturers refined their production methodologies over the years in accordance with their increasing environmental awareness, more recently produced batteries might well have been less toxic than ones produced toward the early end of the time period in question. Again, like so many variables that the Court considers essential to a reasonable apportionment of the harm in this case, there is no evidence that will adequately address this issue.

imposition of joint and several liability is appropriate.

E. *Are the Zacharias Defendants entitled to the "innocent landowner" defense under CERCLA?*

■ The Zacharias Defendants' status as facility owners under CERCLA places them in a slightly different position than the generators/recyclers. Their liability under CERCLA stems not from their "arranging for treatment or disposal" of hazardous substances, but their ownership of the C & R Battery Site at present and at the time of disposal. While the Zacharias Defendants do not dispute this ownership, they assert the third-party defense provided for in 42 U.S.C. § 9607(b)(3) as an absolute bar to their liability. Courts have specifically recognized the "innocent landowner defense" asserted by the Zacharias Defendants on the basis of the general third-party defense set forth in CERCLA. This defense provides protection for those who acquire property *after* it has been contaminated and who did not know or have reason to know of the contamination. *See* 42 U.S.C. § 9601(35)(A). Since different Zacharias Defendants have exercised varying degrees of ownership over the Site at different times, the Court must briefly review the pertinent facts before resolving their alleged entitlement to the defense.

In 1973, Edward A. and William K. Zacharias, the general partners of Zacharias Brothers, purchased a 12.5 acre parcel of property (the "Property"). That parcel was subsequently divided by the Zachariases into a 4.48 acre parcel, a 5.12 acre parcel, a 2.01 acre parcel and a .89 acre parcel. C & R Battery operated its battery-breaking business on part of the Property, which it rented from Zacharias Brothers for all but two years of its 15-year operation. The C & R Battery Superfund Site includes the Property. After renting part of the Property to C & R Battery for 13 years, the Zacharias Brothers transferred two of the subdivided

parcels to themselves and their wives, individually.

■ Zacharias Brothers contends that soon after it purchased the Property, C & R Battery moved its operations from the 2.01 acre parcel to the 4.48 acre parcel.[13] Therefore, it argues, any contamination of the 2.01 and .89 acre parcels must have occurred prior to its ownership of the land. As to the contamination on these two sites, the Zacharias Brothers assert the "innocent landowner" defense; it specifically does not assert the defense as to the contamination that occurred on the property after 1973—on the 4.48 acre parcel. Since the Court holds that the harm to the Site is indivisible, the parcel-by-parcel distinction is one without meaning. Zacharias Brothers was the undisputed owner of the Property—at least the 4.48 acre parcel—during the time of disposal or placement of the hazardous substances thereon. Therefore, like the generator/recycler defendants, it is jointly and severally liable for the response costs incurred to clean up the Site that are not attributable to C & P.

The Zacharias brothers, individually, and their wives, acquired their interests in the Property after disposal. But they still have not demonstrated an entitlement to the innocent landowner defense. In order to establish the defense, the defendants must prove by a preponderance of the evidence that, among other things, they did not know and had no reason to know that any hazardous substance was disposed of on, in or at the facility. 42 U.S.C. § 9601(35)(A)(i). This they cannot do.

The Zacharias brothers, individually, knew there was contamination at the Property. (Zacharias Defs.' Mem. at 6 n. 4). They were notified in a letter from the Office of the Virginia Attorney General to Zacharias Brothers, at least three months prior to the transfer of the two portions of the Property from the partnership to the Zachariases as individuals, of potential hazardous waste problems on the Property.[14] Thus, the

---

**13.** The Zacharias Brothers concede that, for at least a small term during their ownership of the Property, C & R Battery used the 2.01 acre parcel, and that it kept a metal storage shed on

the .89 acre parcel throughout the course of its operations.

**14.** The Zacharias brothers cannot contend that this letter "got lost in the mail." They produced

brothers, as individuals, were not "innocent landowners." Neither were their wives—even if the Court for a second suspends reality and assumes that their husbands did not mention to them the environmental problems at the Site. CERCLA requires parties asserting the "innocent landowner" defense, in order to demonstrate that they had no reason to know of hazardous substance disposal, to make, at the time of acquisition, "an appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice." 42 U.S.C. § 9601(35)(B). The record reveals that a question to their husbands, an inquiry of the state, or a cursory investigation of the Site would have revealed the existence of or potential for contamination.

Thus, none of the Zachariases are "innocent landowners" within the meaning of CERCLA. Their cross-motion for summary judgment will, thus, be denied, and they will be subject to joint and several liability, within the parameters previously articulated by the Court.

## V. CONCLUSION

For the reasons stated above, the defendants named in C & P's Motion for Partial Summary Judgment on Joint and Several Liability will be held jointly and severally liable for those response costs which end up being attributed to all of the defendants in this case, exclusive of those which are attributed to C & P. The Court will engage in this apportionment, including distribution of the orphan shares of liability, at the appropriate stage of this proceeding.

the letter in response to C & P's discovery requests.