**The CITY OF NORTH MIAMI,
FLORIDA, Plaintiff,
(realigned)**

**v.**

**Morris BERGER, Personal Representative
for the Estate of Frank B. Kaufman, et
al., Defendants.**

**Civil No. 92–1344–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 4, 1993.

Robert S. Hall, Jr., Ridgway M. Hall, Jr., William L. Anderson, Judith A. Reinsdorf, Crowell & Moring, Washington, DC, for plaintiff.

Joshua N. Rose, Thomas S. Schaufelberger, Wright, Robinson, McCammon, Osthimer & Tatum, Washington, DC, Robert R. Vieth, McGuire, Woods, Battle & Boothe, McLean, VA, Frank E. Brown, Jr., Joel Dahnke, Mays & Valentine, Alexandria, VA, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

### I.

This CERCLA case grows out of the ill-fated efforts of the City of North Miami, Florida ("City") and various entities and individuals to develop a municipal recreational complex on city-owned property in south Florida. Those efforts included the 1974 to 1980 operation of a landfill at the site, a landfill that is alleged to be the source of hazardous substance releases. In this action, the City seeks to recover from defendants the past and future costs associated with the cleanup and remediation of these hazardous substance releases pursuant to the cost recovery provisions of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* In addition, the City asserts a contribution claim under Florida law.

Defendants in this case are Morris Berger, Personal Representative for the Estate of Frank Kaufman ("Berger" or "the Estate"),

Said Haddad ("Haddad"), Marvin Sadur ("Sadur"), ABC Demolition Company ("ABC"), and Post, Buckley, Schuh & Jernigan ("PBS & J"). Kaufman, Haddad, and Sadur were three of the officers and shareholders of Munisport, Inc. ("Munisport"), the company that undertook the development project and operated the landfill at issue in this case.[1] ABC Demolition Co. and PBS & J were independent contractors that Munisport hired to perform construction and engineering services, respectively, in connection with the development and construction of the recreational complex.

This matter is before the Court on (i) the City's motion for partial summary judgment as to all defendants; and (ii) the summary judgment motions of the Estate, Haddad, Sadur, and PBS & J. Of the defendants, only ABC did not file a motion for summary judgment. Typical of CERCLA cases generally, the liability and damages issues in this case may be appropriately treated separately. The motions at bar present only liability issues, namely whether any of defendants are liable for any remediation or cleanup costs. Reserved for trial are the ordinarily more technically complex factual questions concerning what remediation steps must be taken, what costs are involved, and the proportionate fault of the liable parties. *See Chesapeake and Potomac Tel. Co. v. Peck Iron & Metal Co.,* 814 F.Supp. 1269, 1274 (E.D.Va. 1992) (quoting *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 667–68 (5th Cir.1989) (emphasis added)). In this case, while the parties disagree as to the weight and legal effect to be given to certain facts relating to defendants' CERCLA liability, these disputes do not preclude resolution on summary judgment. Indeed, examination of the undisput-

ed facts presented here compels the conclusion that resolution of defendants' CERCLA liability at the summary judgment stage is manifestly appropriate.

## II.

In October 1972, the City entered into a lease agreement with Munisport, a Florida corporation formed by some of the defendants, under which the City leased to Munisport 281 acres of raw land. Pursuant to the lease agreement, Munisport agreed to develop the land and construct a municipal recreational complex featuring two 18–hole golf courses. In return, the City agreed to lease the property as improved to Munisport for thirty years, during which time Munisport would operate the complex and retain the lion's share of the revenues earned. Munisport was jointly controlled by Frank Kaufman and Said Haddad, each holding 32.5% of the shares. Haddad served as President of the corporation and Kaufman was its Treasurer. The remaining minority shares of Munisport were distributed among various consultants needed to develop the raw land into a recreational facility. Included among these consultants was Marvin Sadur, Munisport's lawyer and corporate secretary, who owned approximately 15% of Munisport's shares.

Soon after the execution of the 1972 lease agreement, the parties agreed to permit Munisport to operate a landfill on the property in order to raise the level of the terrain and help defray the costs of constructing the golf courses. The City and Munisport amended the lease in 1974 to reflect this agreement.[2] Shortly thereafter, the Munis-

---

1. Munisport is not a party in this action because it has been dissolved and has no assets. As such, no claims have been asserted against Munisport, the parties apparently viewing such action as a futile exercise.

2. The lease was amended on February 26, 1974, to provide, *inter alia,* that:
 1. The scope of the recreation project would be expanded to the full 350 acres owned by the City.
 2. "Munisport shall have the right forthwith to undertake, engineer and profit from the operation of a landfill on the entire acreage...."

3. Munisport would clean up and cover the remains of some prior trash disposal operations that had been conducted on the site by another, unrelated party.
*See* 1974 Amendment to Lease Agreement (2/26/74).
The lease agreement was further amended again on December 7, 1976, primarily to reflect an exchange of land in which the City gave the state of Florida a tract of mangrove-supporting wetlands in the southeast part of the Munisport site in exchange for upland acreage to the northeast, contiguous with the City's existing property. This resulted in a 291–acre tract, and the land conveyed to the state in the southeast became

port landfill began accepting household garbage, construction debris, vegetative materials, and industrial and commercial refuse. Munisport retained the services of defendant PBS & J, an engineering firm, to prepare the engineering plans and drawings for the project, assist in obtaining the necessary permits, and provide engineering and consulting services in connection with the operation of the landfill. In addition, Munisport contracted with ABC Demolition Co. to develop the property, operate the landfill, and construct the golf courses and other recreational facilities. Like Munisport, ABC was controlled by Kaufman and Haddad, with each owning 50% of the shares and Kaufman serving as ABC's President. The Munisport landfill operated from 1974 to 1980. During this time, the landfill accepted over 6 million cubic yards of solid wastes, including some hospital wastes and some known toxic wastes, though the precise quantities of these wastes are disputed. Operation of the landfill, Munisport's sole business activity, generated approximately $8 million in revenue for Munisport.

From its inception, the Munisport development project faced intense regulatory scrutiny. In January 1975, in response to an enforcement action by the Florida Department of Pollution Control (which subsequently became the Department of Environmental Regulation or "DER"), Munisport applied for a temporary operating permit for the landfill. This permit issued on May 9, 1975, and reissued on September 21, 1976. It named Munisport as the operator and the City as the owner and imposed a variety of specific operating conditions. A full DER operating permit issued on June 8, 1979. In addition, because the eastern end of the site included approximately 103 acres of wetlands, Munisport obtained a dredge and fill permit from DER on January 5, 1976, which was modified on March 21, 1977. Both of the dredge and fill and the landfill operating permits were subject to the issuance of a comparable dredge and fill permit from the U.S. Army Corps of Engineers under the Federal Water

Pollution Control Act, 33 U.S.C. § 1344. The federal permit issued on March 15, 1976 and expired on March 15, 1979.[3] Permits for the landfill were also obtained from various other local entities, including the Dade County Fire Department. Additionally, the landfill was closely monitored by the Metropolitan Dade County Department of Environmental Resources and the U.S. Environmental Protection Agency ("EPA").

Not surprisingly, the landfill was subjected to private as well as public scrutiny. The project faced opposition from the Florida Audubon Society and from a small but vocal group or neighboring citizens. Given the rigorous regulatory climate and the vigorous local opposition, the City, Munisport, and ABC often found themselves enmeshed in administrative proceedings and civil litigation. In fact, during the operation of the landfill, Munisport was cited for numerous violations of permit conditions and regulatory requirements. Among these violations were the placement of waste in the groundwater, failure adequately to cover the garbage, disposal of hazardous wastes on site, illegal acceptance of hospital wastes, and improper placement of waste within thirty feet of lakes. Defendant Sadur handled all legal proceedings relating to the project, including matters relating to these violations.

In March 1980, the DER notified Munisport and the City of its intent to revoke the landfill operating permit and the state dredge and fill permit based on the various permit and regulatory violations. A year later, following the requisite administrative proceedings, DER revoked these permits. Meanwhile, EPA had been expressing increasing concern that ammonia leachate from the landfill would contaminate groundwater which, in turn, would migrate into the adjacent State Mangrove Preserve. As a result, apparently, of this concern, EPA vetoed Munisport's request for renewal and extension of the Corps of Engineers dredge and fill permit, which had expired on March 15, 1979. Without the permit, Munisport could not take steps to fill the 103 acres of wet-

known as the State Mangrove Preserve ("Mangrove Preserve").

3. The landfill also obtained permits from other agencies, including the Dade County Fire Department.

lands that constituted the eastern portion of the tract. This, in turn, made it impossible to construct the planned 36–hole golf course on the site, thereby threatening the economic viability of the entire project. Thus it was that in July 1980, Munisport, faced with the state permit revocation proceedings and the EPA's announced intent to veto any Corps of Engineers dredge and fill permits, ceased its landfill operations. This ultimately doomed the entire project and Munisport as well. Munisport was dissolved a year later.

On September 8, 1983, EPA listed the Munisport landfill on its CERCLA "National Priorities List" of uncontrolled hazardous release sites. EPA sent letters of potential liability to Haddad, Kaufman, Sadur, Munisport, ABC, the City, and others. In accordance with established CERCLA procedures, EPA conducted a series of extensive environmental investigations of the site, which included comprehensive sampling of surface water, groundwater, soils and sediments. The results of these investigations were set forth in a series of reports,[4] which concluded that hazardous substances had leached out of the landfill into the groundwater, imperiling the adjacent State Mangrove Preserve and, potentially, the more distant Biscayne Bay. More specifically, the report of EPA's remedial investigation, found that groundwater, surface water, sediment and soils all contained organic and inorganic chemicals, many of them CERCLA hazardous substances, chiefly at the relatively low concentration levels typically associated with municipal solid waste landfills. But this report also found that "chronic toxicity was typically observed among the aquatic species exposed the groundwater samples collected from the landfill area." Indeed, another report, the *Mangrove Study* found that ammonia leach-

ate had surfaced in the preserve and presented a "significant threat to aquatic life."

In March 1990, EPA published its "Proposed Plan" for remedial action. The public was invited to comment on this plan, and EPA thereafter held a public meeting in North Miami on the subject. After consideration of public comments, EPA on July 26, 1990, issued its *Record of Decision* ("ROD"), in which it set forth appropriate remedial action and documented in detail the agency's basis for requiring this action.[5] EPA subsequently urged all potentially liable parties under CERCLA to undertake this remedial action voluntarily. Only the City heeded EPA's call. On March 20, 1992, the City entered into a Consent Decree with EPA in the United States District Court for the Southern District of Florida. Under this Consent Decree, the City assumed responsibility for remediation the landfill site. As a result, the City has incurred substantial costs, including, but not limited to, reimbursement of past EPA response costs; technical studies, investigation, and engineering costs; and "enforcement" costs related to the instant lawsuit. Nor is this the end of the matter; it is likely that the City will incur additional costs in the future.

By now, the reader of this saga is surely wondering how this dispute, obviously centered in Miami, came to be litigated in this venue. Interestingly, the Estate of Kaufman, not the City, initiated this action. Following Kaufman's death in 1989, his will was probated in the Circuit Court for Arlington County, Virginia. In probate proceedings before the state court, the City filed a notice of a claim against the Estate, alleging, as it does here, that Kaufman was liable under CERCLA for the cleanup and remediation of the Munisport landfill. Subsequently, Berger, the Estate's personal representative,

4. These reports include the following: EPA's *Remedial Action Master Plan Report* (Sept.1984); EPA's Hazardous Waste Site Investigation (Dec. 11, 1984); *Final Remedial Investigation Report for the Munisport Landfill Site* (prepared by Camp, Dresser and McKee for EPA, March 25, 1988); a *Water Quality and Toxic Assessment Study, Mangrove Preserve, Munisport Landfill Site* (June 1989, "Mangrove Study"); and the *Draft Feasibility Study Addendum* (prepared by CH2M Hill for EPA in March 1990).

5. The major components of the remedial action are (i) interception and collection of the leachate-contaminated groundwater prior to its emergence in the State Mangrove Preserve through construction of a series of extraction wells; (ii) treatment of the contaminated groundwater followed by appropriate disposal; (iii) hydrologic improvements to the State Mangrove Preserve and adjacent areas; and (iv) further hydrologic, hydrogeologic, and treatability studies.

filed a 28 U.S.C. § 2201 action for declaratory judgment in this Court, seeking a declaration that the Estate is not liable under CERCLA, or in the alternative, for a declaration apportioning liability among the various parties. The Estate named the City, Haddad, Sadur, PBS & J, and ABC as defendants. Defendants, in turn, filed various counterclaims against the Estate and cross claims against each other.[6] The alignment of the parties was somewhat confusing, however, as it did not clearly reflect the essential nature of the suit: the City's claim that the other parties were also "operators" or "generator-arrangers" with respect to the landfill and should therefore, under CERCLA, pay their appropriate shares of cleanup and remediation costs. The parties recognized that their alignment did not reflect the essence of the dispute and, by stipulation, agreed to a realignment, with the City cast as plaintiff and the other parties as realigned defendants. Presented for decision here then is: (i) whether defendants can be held liable under CERCLA as "operators" or "generator/arrangers;" and/or (ii) whether defendants are liable to the City in contribution under Florida state law.

### III.

■ To establish a defendant's liability under CERCLA in a cost recovery action, a plaintiff must prove: (i) that the site in question is a "facility" as defined in 42 U.S.C.

§ 9601(9); (ii) that a release or threatened release of a hazardous substance has occurred on the site; (iii) that the release or threatened release has caused plaintiff to incur response costs; and (iv) that each defendant falls within one of the categories of "liable parties" set forth in § 9607(a). *Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1152–3 (9th Cir.1989); *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 668 (5th Cir. 1989); *C & P Telephone, supra,* 814 F.Supp. at 1274.[7] Because it is undisputed that none of the defenses to CERCLA liability specifically enumerated in § 9607(b) are applicable in this case,[8] the City is entitled to summary judgment if it can establish these four elements as to each defendant. *C & P Telephone, supra,* 814 F.Supp. at 1274. Should the City succeed in this respect, entry of summary judgment as to liability is appropriate "even when genuine issues remain regarding the apportionment of damages among responsible parties." *Id.*

■ These principles, applied to the facts at bar, make clear that the first three elements of CERCLA liability are easily established. First, the Munisport landfill site is unquestionably a "facility," as defined by Section 101(9) of CERCLA, 42 U.S.C. § 9601(9). According to this section,

> [t]he term 'facility' means (A) any building, structure, installation, equipment, pipe or

6. Efforts to transfer this matter pursuant to 28 U.S.C. § 1404(a) failed. For reasons not apparent in the record, another judge of this division refused to transfer the matter to a federal district court in Florida.

7. CERCLA specifically authorizes private parties to bring actions for recovery of costs incurred in responding to a "release" of hazardous substances from a "facility." *See C & P Telephone,* 814 F.Supp. at 1277–78. CERCLA Section 107(a), 42 U.S.C. § 9607(a), provides, in pertinent part, that the costs recoverable from a liable party include:

> (A) All costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the National Contingency Plan;
> (B) Any other necessary costs of response incurred by *any other person* consistent with the National Contingency Plan....

> Nor is a private party precluded from bringing a CERCLA action under § 9607(a)(4)(B) where,

as here, the private party is, or may be, itself liable under CERCLA. *Id.,* at 1278. *See also United States v. Kramer,* 757 F.Supp. 397, 416 (D.N.J.1991) ("Section 107 permits the Government or a private party to go in, clean up the mess, pay the bill, then collect all its costs not inconsistent with the NCP [National Contingency Plan] from other responsible parties—even if plaintiff was also responsible for the contamination"); *FMC Corp. v. United States Department of Commerce,* 786 F.Supp. 471, 486 (E.D.Pa.1992); *Sand Springs Home v. Interplastic Corp.,* 670 F.Supp. 913, 915–16 (N.D.Okla.1987).

8. 42 U.S.C. § 9607(b) sets forth three defenses that may be asserted to avoid CERCLA liability. Under this section, a defendant must prove that the release or threatened release of a hazardous substance and resulting damage were caused solely by (i) an act of God; (ii) an act of war; or (iii) an act or omission of a third party. None of these defenses appear applicable here, nor have any of the defendants asserted them.

pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, *landfill*, storage container, motor vehicle, rolling stock, or aircraft, or (B) *any site or area where a hazardous substance has been deposited, stored, disposed of or placed, or otherwise come to be located;* but does not include any consumer product in consumer use or any vessel. (emphasis added).

Clearly, the Munisport site is a "landfill," as specifically listed in paragraph (A), and is also a "site or area where a hazardous substance has been deposited, ... disposed of, or placed, or otherwise come to be located" within the meaning of paragraph (B). Thus, the first element of CERCLA liability is plainly established.

■ Nor is there any doubt that the second element is satisfied here. EPA has determined that there has been "release or threatened release of a hazardous substance" from the Munisport site. This conclusion is supported by the facts set forth in its *ROD* concerning the Munisport landfill. In addition, the Consent Decree, entered into by the City and the EPA after public notice and opportunity for comment, contains an express finding that there has been "a release or threat of release of a hazardous substance at or from the site." Abundant evidence supports this conclusion, including the numerous reports prepared in connection with the EPA investigation of the Munisport site,

and hence the second element of CERCLA liability is readily established.

■ And finally, equally readily established is the third element of the test, namely, that the release or threatened release has caused the City to incur "response" costs. It is undisputed that the City has already incurred response costs in undertaking the remedial action required under the Consent Decree to respond to the releases of hazardous substances from the Munisport site.[9] These include, *inter alia,* reimbursement of the EPA's past response costs, expenses to conduct investigations of site conditions, and payments to an independent contractor to carry out the remedial design studies. Of course, at the liability stage, the City need only establish the fact that it has incurred *some* costs in responding to the release of hazardous substances, not the precise amount of the costs or their reasonableness. *See C & P Telephone,* 814 F.Supp. at 1274. Contrary to defendants' arguments, the City need not, at this stage, prove these response costs are "necessary" and "consistent with the National Contingency Plan," as required under § 9607(a)(4)(B). These are matters for the damages/contribution phase of the CERCLA cost recovery action. *Id.* at 1276.

The absence of dispute as to the first three elements of CERCLA liability is in stark contrast to the sharp dispute among the parties as to the fourth element. Indeed, this

---

9. "Response costs" are costs incurred in connection with the cleanup and remediation of hazardous substances. Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), provides that:

The terms 'respond' or 'response' means remove, removal, remedy, and remedial action, all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto.

The term "removal" is defined by statute, in pertinent part, as follows:

The terms 'remove' or 'removal' means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the envi-

ronment, which may otherwise result from a release or threat of release....

42 U.S.C. § 9601(23).

In addition, the term "remedial action" is defined in Section 101(24), 42 U.S.C. § 9601(24), in pertinent part, as follows:

The terms 'remedy' or 'remedial action' means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes ... any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment....

Given this, the actions taken by the City under the terms of the Consent Decree are plainly "response costs" under the statute.

fourth element, namely whether each defendant falls within one of the four categories of "liable persons" set forth at 42 U.S.C. § 9607(a)(1)–(4), is the focus of the liability dispute at bar. To prevail in this CERCLA action, the City must establish its claim that the defendants were "operators" or "generator/arrangers" of hazardous wastes.[10] If the City can establish that a defendant falls within either of these categories, entry of summary judgment on liability as to that defendant is appropriate, as CERCLA imposes strict liability on such all such "liable persons." *United States v. Monsanto Co.*, 858 F.2d 160, 167 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). Moreover, should two or more of the defendants prove to be "liable persons" under CERCLA, the imposition of joint and several liability is warranted. *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1507 (6th Cir.1989), *cert. denied*, 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990); *Monsanto*, 858 F.2d at 171–72.[11]

## A. Operator Liability

■ CERCLA imposes strict liability on those who "operated any facility at which [ ] hazardous substances were disposed of...."

42 U.S.C. § 9607(a)(2). To be an "operator" for CERCLA purposes, a defendant "need not have exercised actual control" [over a "facility"] "so long as the authority to control the facility was present." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 836–37 (4th Cir.1992) (quoting *Nurad, Inc. v. Hooper & Sons Co.*, 966 F.2d 837, 842 (4th Cir.1992), *cert. denied sub nom. Mumaw v. Nurad, Inc.*, —— U.S. ——, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992)). Indeed, "authority to control—not actual control—[is] the appropriate standard" to be used in determining a defendant's liability under CERCLA as an "operator." *Nurad*, 966 F.2d at 842. As the *Nurad* court stated:

This is the definition of the word 'operator' that most courts have adopted, and it is one which properly declines to absolve from CERCLA liability a party who possessed the authority to abate the damage caused by the disposal of hazardous substances but who declined to actually exercise that authority by undertaking efforts at a cleanup." *Id.*

As such, the "authority to control" standard prevents a responsible person from insulating himself from liability by simply standing idle. *Id.* at 845.[12]

---

**10.** Specifically, 42. U.S.C. § 9607(a)(1)–(4) provides that the following classes of persons are liable or potentially liable under CERCLA:
(1) the owner and operator of a vessel or facility,
(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
(3) any person who by contract, agreement, or otherwise arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person ...
The term "person" is broadly defined to include individuals, firms, corporations, associations, and partnerships. 42 U.S.C. § 9601(21). The City makes no claim that any defendant is an "owner" or "transporter."

**11.** Imposition of joint and several liability may be appropriate in the event the contamination arising from operation of the Munisport landfill

is a case of "indivisible harm." *See Monsanto*, 858 F.2d at 171 ("While CERCLA does not mandate the imposition of joint and several liability, it permits it in cases of indivisible harm.") Pertinent here is the test set forth in Restatement (Second) of Torts § 433A (1965), which provides:

(1) Damages for harm are to be apportioned among two or more causes where
 (a) there are distinct harms, or
 (b) there is a reasonable basis for determining the contribution of each cause to a single harm.
(2) Damages for any other harm cannot be apportioned among two or more causes.
In this case, joint and several liability is likely appropriate because it appears that the migration of ammonia leachate from the site cannot reasonably be attributed to distinct and separate harms, thereby precluding precise apportionment of liability.

**12.** *See also Robertshaw Controls Co. v. Watts Regulator Co.*, 807 F.Supp. 144, 152 (D.Me.1992) (holding that "to compel an element of actual participation or involvement in hazardous waste disposal before imposing liability on corporate officers is to ignore the will of Congress regarding strict liability ...").

It remains now to apply the "authority to control" standard to each defendant to assess whether that defendant is liable for response costs as an "operator" under CERCLA.

### 1. *Said Haddad*

■ Applied here, the *Nurad/Carolina Transformer* "authority to control" standard compels the conclusion that Said Haddad is liable under CERCLA as an "operator." Undisputed facts in the record disclose that Haddad exercised direct and substantial control over the day-to-day operations of the landfill. Haddad maintained an on-site office, directed the actual landfilling operations, and hired, fired, and supervised employees. In essence, he acted as Munisport's on-site manager. The exercise of this *actual* control compels imposition of operator liability; for while such proof is not required under the *Nurad/Carolina Transformer* test, the exercise of actual control is clear evidence of Haddad's authority to control the landfill operations.

Haddad's substantial influence over management decisions concerning all aspects of the Munisport development project further supports imposition of CERCLA liability. In addition to exercising actual control over the landfill facility itself, Haddad had authority to control the management of Munisport. He owned 32.5% of Munisport, 50% of the shares of ABC, and acted as a director and officer of each. By his own admission, he shared ultimate decisionmaking authority over the Munisport project with Kaufman as "equal partners" in the venture. His deposition testimony, as well as other evidence in the record, reflects that while neither he nor Kaufman owned a majority of the shares of Munisport or ABC, each had authority to control the development operations insofar as all major decisions required their joint approval. Given this, and given his actual involvement in the day to day operations of the landfill, Haddad, as analogous authority reflects, was manifestly an "operator" under the *Nurad/Carolina Transformer* "authority to control" standard, and thus falls squarely within the class of "liable persons" under CERCLA.[13]

### 2. *Frank Kaufman*

■ Kaufman, too, falls within this class. Like Haddad, Kaufman owned 32.5% of Munisport and 50% of ABC, acting as Treasurer and President, respectively, of these companies. In his role as Treasurer of Munisport, it is undisputed that Kaufman signed checks, maintained insurance on equipment, and had some administrative role relating to the payroll, accounts payable, and accounts receivable. The record further reflects that Kaufman obtained information concerning landfilling operations at the project's inception, communicated rate increases to landfill customers, and attended major meetings concerning the project. In addition, Kaufman visited the Munisport site on numerous occasions, making visits on a bi-weekly basis at one point in time. Admittedly, the parties dispute whether Kaufman's site visits to Florida were prompted by affairs of the heart or business reasons.[14] Also hotly disputed is the extent of Kaufman's involvement in the actual management of the landfill operations.

While these disputes preclude entry of summary judgment as to liability on the basis of *actual control,* ample evidence in the record concerning Kaufman's involvement in site operations establishes his *authority to control* Munisport's operations. In this regard, quite apart from any actual involvement he may have had in the landfill operations, Kaufman, like Haddad, unquestionably retained the authority to direct and influence, the management of the entire development

---

**13.** *See United States v. Amtreco, Inc.,* 809 F.Supp. 959 (M.D.Ga.1992) (imposing liability on president, sole director and stockholder of corporation who actively participated in its management, hired and fired employees, dealt with customers, and maintained an office on site); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1052 (2d Cir.1985) (imposing liability on sole stockholder and officer of corporation who was "in charge" of its management); *Donahey v. Bogle,* 987 F.2d 1250, 1254 (6th Cir.1993) (imposing CERCLA liability on sole stockholder of corporation because "he had authority to prevent the contamination of the property by his corporation").

**14.** The affidavit of Kaufman's widow asserts that Kaufman made his visits to Florida in order to court her, not to monitor operations on the Munisport site.

project venture. To be sure, Haddad, not Kaufman, directed the day-to-day operations of the landfill and had greater personal involvement in the management of the Munisport site. Yet, Haddad, Kaufman's long-time business partner, testified unequivocally at his deposition that he and Kaufman shared ultimate decisionmaking authority over Munisport's operations. Haddad's undisputed testimony is also supported by other evidence in the record, including the deposition testimony of other Munisport employees. Kaufman therefore had sufficient authority to control to justify imposition of operator liability.

 This conclusion is not undermined by defendants' arguments that CERCLA liability cannot be imposed on a corporate officer or shareholder under the *Nurad/Carolina Transformer* standard absent a showing that the officer retained a majority of the shares of the company—i.e., that the shareholder legally controlled the company. To be sure, courts have imposed operator liability on corporate officers and shareholders where defendants were either sole shareholders or possessed a majority of the company's shares.[15] But the relevant inquiry is not whether a particular defendant possesses 51% or more of the shares of a company. Rather, it is whether the corporate officer, because of the realities of the corporate power structure, has the authority and the ability to control the management of the company if he so chooses. Put another way, the relevant inquiry is whether the officer is a *managing* shareholder who, for some reason—whether by virtue of majority ownership or the agreement of the other shareholders, or the indifference or acquiescence of the other shareholders—can direct the overall operations of a corporation and, in doing so, has the authority to control the facility in question. While the ability to exert such control is more readily apparent where the defendant is a sole or majority stockholder, the broad, remedial purpose of CERCLA militates against restricting the scope of operator liability only to those shareholders. Where, as here, a corporate officer is a managing shareholder and shares equally the ultimate decisionmaking authority for a company's operations, he may be held liable as an "operator" for the release of hazardous substances at a "facility" operated by the company.[16] As a result, Kaufman's liability as an "operator" of the Munisport site is clearly established.

### 3. Marvin Sadur

 Sadur's case stands on a different footing. Although a Munisport officer, the record discloses he had no real decisionmaking powers. A corporate officer or shareholder who lacks meaningful decisionmaking authority cannot be held liable under CERCLA as an operator. *Nurad,* 966 F.2d 837. *See also Kelley ex rel. Mich. Natural Resources Comm. v. ARCO Industries Corp.,* 723 F.Supp. 1214, 1220 (W.D.Mich.1989) (mere status as corporate officer or director insufficient to impose CERCLA liability). Here, neither Sadur's status as corporate secretary for Munisport, nor his 15% ownership of the company subject him to CERCLA liability. While Sadur had a financial stake in the success of the Munisport project, his primary role was that of Munisport's lawyer. In this role, Sadur, *inter alia,* provided legal advice relating to development of the proposed recreational complex, helped to pro-

**15.** *See e.g., Amtreco,* 809 F.Supp. 959; *Shore Realty Corp.,* 759 F.2d 1032.

**16.** *See Vermont v. Staco, Inc.,* 684 F.Supp. 822 (D.Vt.1988), *vacated on other grounds,* 1989 WL 225428 (D.Vt.1988) (three managing shareholders who shared decisionmaking authority over the overall operations of company all held liable as "operators"); *Bowen Engineering v. Estate of Reeve,* 799 F.Supp. 467 (D.N.J.1992) (40% shareholder of parent company of company that operated "facility" held to be "operator").

Particularly pertinent here is *Staco,* where the court held that each of three equal shareholders were "operators" because they shared equal control. The testimony of one the of the *Staco* shareholders mirrors that of Haddad here:

> We, the three of us, make decisions that relate to the managing businesses and the marketing businesses and the selling businesses and the overall operations of the company.

*Staco,* 684 F.Supp. at 831–2. Like the *Staco* shareholder, Haddad testified that he and Kaufman were "equal partners" in the Munisport venture and exercised joint control over its operations.

cure the necessary permits, negotiated with the City, represented Munisport in numerous administrative and judicial proceedings involving the project, and represented Munisport before the North Miami City Council. And while the City notes that Sadur, as an officer and shareholder of Munisport, received fees above and beyond those for legal services rendered,[17] this additional compensation does not bear on the extent of Sadur's authority to control the corporation. Ultimate decisionmaking authority over the development project and the landfill operations resided with Kaufman and Haddad. Haddad, as well as other individuals associated with the project, admitted as much in their deposition testimony. Sadur's role was completely subordinate to that of Kaufman and Haddad. At most, he was a business and legal adviser, and he did the day-to-day legal work of the project. Accordingly, Sadur cannot be deemed to have possessed the requisite authority to control the landfill that would subject him to CERCLA liability as an operator.[18]

Nor did Sadur exercise actual control over Munisport's landfill operations. Evidence in the record clearly reveals that Haddad, not Sadur, supervised the day-to-day operations of the landfill. Sadur's legal services, while they plainly furthered and facilitated the development of the Munisport project, cannot be equated with management control of the landfill operations. Sadur did not direct the placement of wastes, supervise employees, or otherwise actively participate in the management of the landfill. As a result, the nature of Sadur's participation in the project does not justify imposition of operator liability on the basis of actual control. To hold otherwise would impermissibly broaden the scope of CERCLA liability to include all lawyers who provide legal services to landfill owners and operators. Such a rule stretches CERCLA liability too far and cannot be adopted.[19]

### 4. Post, Buckley, Schuh & Jernigan

█ To hold that PBS & J is an "operator" would similarly represent an untenable extension of CERCLA liability. PBS & J, unlike Haddad, Kaufman, and Sadur, had no ownership interest in, or corporate ties to, Munisport. Instead, PBS & J was an independent contractor hired by Munisport to provide technical and engineering services in connection with the operation of the landfill. Pursuant to its contract with Munisport, PBS & J prepared site plans for the landfill, assisted in procuring necessary permits, prepared solid waste quantity projections, provided consultation and advice, and provided instruction and guidelines concerning the maintenance and operation of the landfill. Admittedly, PBS & J's status as an independent engineering contractor does not, in and of itself, insulate it from CERCLA liability. *Kaiser Aluminum & Chemical Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1342 (9th Cir.1992) (independent contractor may be CERCLA operator if it had "authority to control" hazardous wastes that were source of contamination). But close examination of the record reveals that PBS & J had neither actual control nor the authority to control Munisport's landfill operations.

Significantly, ABC Demolition Co., not PBS & J, performed the construction work on the site and actually placed the wastes in the landfill. While PBS & J designed the site, instructed landfill employees on issues relating to waste disposal, and provided general guidelines in this regard, PBS & J employees did not actively participate in the disposal or placement of wastes in the landfill. Put another way, PBS & J did not actually exercise physical control over any

---

**17.** Sadur apparently received a percentage of the gross sales from the landfill operations.

**18.** *See Nurad,* 966 F.2d 837 (holding that brothers who were vice presidents of a responsible corporation were not liable as "operators" because any authority they possessed was "entirely subordinate" to that of their father, who, as president and majority stockholder, exercised ultimate authority over the finishing plant).

**19.** While, to be sure, such a stretch would promote CERCLA's broad remedial goal of ensuring adequate funds for waste cleanup, "[i]t is enough to respond that statutes have not only ends but also limits. Born of compromise, laws such as CERCLA ... do not pursue their ends to the logical limits." *Edward Hines Lumber Co. v. Vulcan Materials Co.,* 861 F.2d 155, 157 (7th Cir.1988).

wastes disposed of at the Munisport site. Given this, the City's reliance on *Kaiser*, 976 F.2d 1338 (9th Cir.1992) is misplaced. There, the Ninth Circuit reversed the district court's dismissal of a CERCLA claim for failure to state a claim, holding that an excavator could be liable as an operator for purposes of CERCLA where it is established that the excavator actually graded the soil on the site, thereby spreading the contamination throughout the property at issue. In this case, however, it is undisputed that PBS & J never exercised similar control over the wastes or the landfill site.

Nor did PBS & J possess the authority to control, supervise or direct the actual, day-to-day operation of the landfill. Ample evidence in the record reflects that Haddad and Kaufam retained this authority to control the facility. PBS & J's role in the Munisport venture can be likened to that of the independent contractor in *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155 (7th Cir.1988). At issue in *Hines* was the operator liability under CERCLA of Osmose, a company that designed and built a wood processing plant under contract for another company. Osmose not only built the plant, it trained employees, and reserved the right to inspect the plant after construction for quality control purposes. The *Hines* court held imposition of operator liability to be inappropriate because Osmose did not assume control of the daily plant operations once it was built, nor did it have the right to interfere with operational decisions relating to the plant. *Id.* In the present case, PBS & J, like Osmose, lacked the authority to direct the operations of the Munisport landfill. Admittedly, PBS & J's situation differs somewhat from that faced by Osmose in *Hines* insofar as PBS & J rendered assistance *after* the initial inception of the landfill and during

the time wastes were being disposed of on the site. But this is not a crucial distinction. The crucial point is that PBS & J had no authority to make the final operational decisions. It could inspect the site, render advice relating to the placement of wastes, and the like, but the ultimate authority whether to implement such advice resided with Haddad and Kaufman. Accordingly, PBS & J's role as an independent engineering contractor for the Munisport site does not render it an operator under CERCLA. Indeed, imposing CERCLA liability on independent contractors such as PBS & J would mean that operator liability could be extended to ensnare virtually all consultants and contractors who provide advice relating to the operation of a waste site.[20] Thus, like Sadur, PBS & J's role in the landfill operations cannot be deemed to trigger operator liability, lest CERCLA's net be stretched beyond its reasonable limits.

**5. *ABC Demolition Company***

■ By contrast, ABC's operator liability under CERCLA is undisputed. Unlike PBS & J, ABC exercised actual physical control over the wastes and can be likened to the excavator in *Kaiser*. ABC, under Haddad's direction and control, actually performed the construction and waste disposal work on the Munisport site. As such, operator liability is clearly appropriate. Curiously, neither the City nor ABC submitted any memoranda relating to the issue of ABC's CERCLA liability. It appears that the parties in this case view ABC as judgment proof, since it has been dissolved and has no assets, save for an insurance policy. The City, however, has moved for summary judgment against ABC in the event the insurance policy has some value. While this may or may not be

**20.** As the *Hines* court stated:
The statute [CERCLA] does not fix liability on slipshod architects, clumsy engineers, poor construction contractors, or negligent suppliers of on the job training—and the fact that Osmose might have been all four rolled into one does not change matters. The liability falls on owners and operators; architects, engineers, construction contractors, and instructors must chip in only to the extent they have agreed to do so by contract.

*Hines*, 861 F.2d at 157.
That PBS & J may have given bad advice to Munisport concerning the operation of the landfill does not render it liable under CERCLA. Rendering bad advice or providing ineffective technical assistance may give rise to a cause of action against PBS & J in tort or contract, but such actions do not, absent "authority to control" the development project, justify imposition of operator liability.

the case, ABC's operator liability is clearly established.

## B. *Generator/Arranger Liability*

■ Closely related to the issue of operator liability under CERCLA is the issue of "generator"/"arranger" liability. Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), provides that liable persons also include:

> any person who by contract, agreement, or otherwise *arranged* with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances....

For the most part, the generator/arranger liability of the respective defendants in this case should be coextensive with operator liability. ABC, Haddad, and Kaufman appear to be "arrangers" insofar as they, as established above, had the "authority to control the handling and disposal of hazardous substances" at the facility. *United States v. NEPACCO*, 810 F.2d 726, 743–44 (8th Cir. 1986), *cert. den.* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987).[21] In any event, determination of "arranger" liability for these defendants is unnecessary in light of their established liability as "operators."

Similarly, imposition of arranger liability is unwarranted with respect to defendants Sadur and PBS & J. No evidence exists in the record to suggest that either of these parties "arranged" with a transporter for the delivery of hazardous wastes to the Munisport site. As established above, neither Sadur nor PBS & J had any operational control over the landfill and, as such, could not direct the movement or disposal of the wastes deposited therein. Accordingly, no CERCLA "arranger" liability arises with respect to these defendants.

## IV.

■ The City, in addition to asserting a CERCLA private cost recovery action, has alleged that defendants are liable under Florida state contribution law. This claim is meritless. Review of the record indicates that no underlying tort or other cognizable state law claim has been asserted against the City so as to give rise to a claim for contribution under state law. Florida has adopted the Uniform Contribution Among Tortfeasors Act, codifying the common law of contribution. *Fla.Stat.* § 768.31. This statute limits the right of contribution to situations where "two or more persons become jointly and severally liable in tort for the same injury to person or property." *Fla.Stat.* § 768.31(2)(a). Yet the City has not alleged, nor are there facts in the record to indicate, that it is subject to tort liability in connection with the Munisport project. Accordingly, no § 768.31 contribution rights exist.

Moreover, no joint obligation arises under state law outside of the tort context. The two cases cited by the City, *VTN Consolidated, Inc. v. Coastal Engineering Associates*, 341 So.2d 226 (Fla.Dist.Ct.App.1976), and *Lopez v. Lopez*, 90 So.2d 456 (Fla.1956), simply stand for the proposition that the equitable doctrine of contribution is applied to prevent one joint obligor from being required to pay more than his share of a common burden. But no need exists here to invoke this equitable doctrine in the absence of an underlying state law claim. Contribution issues arising from the release of hazardous substances at the Munisport landfill are adequately addressed under the federal CERCLA action. Indeed, no state law contribution issues are even raised here, especially in light of the Court's earlier dismissal of the City's claim that defendants violated *Fla.Stat.* § 403, the state environmental law statute. As a result, the City's state law contribution claim must be dismissed and summary judgment entered for defendants as to this claim.

## V.

For the reasons stated above, the Court grants in part and denies in part the City's motion for partial summary judgment, and

---

**21.** Contrary to defendants' argument, they need not have had legal title over the wastes to be held liable as "arrangers." The authority to control the wastes is sufficient for arranger liability. *NEPACCO,* 810 F.2d at 743.

imposes CERCLA liability on the Estate of Kaufman, Haddad, and ABC. As such, the summary judgment motions of these defendants are denied as to CERCLA liability, but those of defendants Sadur and PBS & J are granted. In addition, the Court dismisses the City's claim for contribution under Florida state law.